# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ACTIVISION BLIZZARD, INC.    )        Consolidated
STOCKHOLDER LITIGATION            )        C.A. No. 8885-VCL

## OPINION

Date Submitted: March 4, 2015
Date Decided: May 20, 2015

Joel Friedlander, Jeffrey M. Gorris, FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; Jessica Zeldin, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Lawrence P. Eagel, Jeffrey H. Squire, BRAGAR EAGEL & SQUIRE, PC, New York, New York; *Attorneys for Plaintiff.*

Raymond J. DiCamillo, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Joel A. Feuer, Michael M. Farhang, Alexander K. Mircheff, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California; *Attorneys for Defendants Vivendi S.A., Philippe Capron, Frédéric Crépin, Régis Turrini, Lucian Grainge, Jean-Yves Charlier, and Jean-François Dubos.*

R. Judson Scaggs, Jr., Shannon E. German, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; Robert A. Sacks, Diane L. McGimsey, SULLIVAN & CROMWELL LLP, Los Angeles, California; William H. Wagener, SULLIVAN & CROMWELL LLP, New York, New York; *Attorneys for Defendants Robert A. Kotick, Brian G. Kelly, ASAC II LP, and ASAC II LLC.*

Garrett B. Moritz, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; William Savitt, Ryan A. McLeod, Benjamin D. Klein, WACHTELL, LIPTON, ROSEN & KATZ, New York, New York; *Attorneys for Defendants Robert J. Corti, Robert J. Morgado, and Richard Sarnoff.*

Edward P. Welch, Edward B. Micheletti, Sarah Runnells Martin, Lori W. Will, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; *Attorneys for Nominal Defendant Activision Blizzard, Inc.*

**LASTER, Vice Chancellor.**

Anthony Pacchia (the "Lead Plaintiff") and his attorneys ("Lead Counsel") challenged a transaction in which Vivendi S.A. divested its controlling equity position in Activision Blizzard, Inc. ("Activision" or the "Company"). The transaction restructured Activision's governance profile and stockholder base, so this decision calls it the Restructuring.

Shortly before trial, the parties entered into what this decision refers to as the Settlement. In exchange for a global release of all claims relating to the Restructuring, the defendants agreed to (i) pay $275 million to Activision, (ii) reduce a cap on the voting power wielded by Activision's two senior officers from 24.5% to 19.9%, and (iii) expand Activision's board of directors (the "Board") to include two independent individuals unaffiliated with the two senior officers.

When Lead Counsel sought court approval for the Settlement, three objectors appeared. Douglas Hayes, who previously sought the lead plaintiff role, lodged the only objection to the Settlement itself. Hayes did not argue that he could have extracted more monetary or non-monetary consideration from the defendants. He rather complained that the Settlement did not allocate any consideration to Activision's stockholders as a class, and he complained most about its failure to provide any consideration to former stockholders who sold their shares. Joint objectors Milton Pfeiffer and Mark Benston did not object to the Settlement. They sought a fee award for their counsel.

This decision approves the Settlement, awards $72.5 million to Lead Counsel, and authorizes Lead Counsel to make a $50,000 payment to the Lead Plaintiff from their award. It denies any fee award to Pfeiffer and Benston's counsel.

1

# I.    FACTUAL BACKGROUND

The facts are drawn from the allegations of the Verified Fifth Amended Class and Derivative Complaint (the "Complaint"), which was the operative pleading at the time of the Settlement, and from the affidavits and supporting documents submitted in connection with the application court approval. Lead Counsel filed the Complaint two months before trial, after completing discovery. The pleading is lengthy, detailed, and contains quotations from the defendants' internal documents and depositions. The Complaint's contents provide a sound basis for evaluating the Settlement, because its allegations present Lead Counsel's claims in the strongest possible light. After trial, once the defendants introduced competing evidence, Lead Counsel's case could only become weaker. If the Settlement is adequate when judged against the allegations of the Complaint, then it should compare favorably to the range of potential outcomes post-trial. What follows are not formal factual findings, but rather how the court regards the record for purposes of evaluating the Settlement.

## A.    The Parties

Nominal defendant Activision is a Delaware corporation with its headquarters in Santa Monica, California. Its stock trades on Nasdaq under the symbol "ATVI." Activision is a leading player in the interactive entertainment software industry and one of the largest video game publishers in the United States.

Defendant Vivendi is a *société anonyme* organized under the laws of France with its headquarters in Paris. Vivendi is a multinational media and telecommunication company that operates in the music, television, film, publishing, Internet, and video

games sectors. Before the Restructuring, Vivendi owned 683,643,890 shares of Activision common stock, representing 61% of the outstanding shares. Vivendi also had the right to appoint six members to Activision's eleven-member Board.

Individual defendants Philippe Capron, Frédéric Crépin, Régis Turrini, Lucian Grainge, Jean-Yves Charlier, and Jean-François Dubos were the Vivendi designees on the Board who voted in favor of the Restructuring. Individual defendants Robert Kotick, Brian Kelly, Robert Corti, Robert Morgado, and Richard Sarnoff were the other five members of the Board who voted in favor of the Restructuring. Corti, Morgado, and Sarnoff were outside directors. Kelly was Chairman of the Board. Kotick served as Activision's CEO.

Defendant ASAC II LP ("ASAC") is an entity that Kotick and Kelly formed to participate in the Restructuring. ASAC is an exempt limited partnership established under the laws of the Cayman Islands. ASAC's general partner is ASAC II, LLC ("ASAC GP"), a Delaware limited liability company. Kotick and Kelly are the managers of ASAC GP. Through ASAC GP, Kotick and Kelly control ASAC.

## B. The Impetus For The Restructuring

In 2012, Vivendi was burdened with over $17 billion in net debt and needed liquidity. Vivendi's CEO informed Kotick that given its financial situation, Vivendi wanted to explore strategic alternatives for Activision.

The Board retained JP Morgan to provide advice about strategic alternatives. After evaluating a range of possibilities, JP Morgan identified two that would be attractive to both Vivendi and Activision's unaffiliated stockholders: selling Activision to a third

3

party or having Activision redeem Vivendi's equity. JP Morgan advised that Activision could redeem nearly 80% of Vivendi's stake using $1.4 billion of Activision's available domestic cash plus $5.5 billion of new third-party debt. JP Morgan advised that the balance of Vivendi's stake could be monetized through a secondary offering or by selling it to a financial investor.

JP Morgan identified two strategic alternatives that would achieve Vivendi's liquidity needs but would *not* be attractive to Activision's unaffiliated stockholders: a debt-financed special dividend or a sale of Vivendi's shares to a third party. The former would limit Activision's strategic flexibility without reducing Vivendi's ownership stake. The latter would substitute one controlling stockholder for another.

## C.     Kotick And Kelly See An Opportunity.

In July 2012, Vivendi announced its interest in selling its Activision stake. In August, Kotick and Kelly began pursuing a transaction that would benefit themselves. They prepared a pitch book to raise $2-3 billion for an investment vehicle that would buy 38-44% of Activision. They presented the idea to Peter Nolan, then the Managing Partner of Leonard Green & Partners, L.P. ("Leonard Green"). They also approached other parties with whom Activision had relationships, including Activision's strategic partners in China. The independent directors were unaware of Kotick and Kelly's efforts.

In December 2012, Vivendi's CEO informed Kotick that Vivendi's discussions with third parties about its Activision stake had not panned out. Vivendi's CEO stated that at the next meeting of the Board, the Vivendi representatives would propose a special dividend of roughly $3 billion to be funded with cash on hand and new debt.

4

JP Morgan prepared a presentation analyzing the special dividend. JP Morgan opined that the special dividend "will almost certainly destroy significant value to shareholders" and justified "increased investor concerns about potentially diverging interests between [Vivendi] and [Activision]." JP Morgan recommended a full repurchase of Vivendi's stake in three parts: (i) the majority repurchased by Activision using cash and debt, (ii) $2-3 billion acquired by investors "supportive of management," and (iii) a marketed secondary offering of the balance of Vivendi's stake. JP Morgan stated that it was "highly confident" that the transaction could be carried out.

On January 29, 2013, Kotick and Kelly submitted an informal proposal to Vivendi that contemplated Vivendi selling its entire Activision stake for $9 billion (a price representing a 15% premium to market) with Activision buying the majority and an investor group led by Kotick and Kelly purchasing the balance. Vivendi asked for more specifics, and on February 14, Kotick and Kelly formally proposed a two-part transaction in which (i) Activision would repurchase two-thirds of Vivendi's stake for $6 billion, or $13.15 per share, using $4.7 billion in financing provided by JP Morgan and $1.3 billion in cash, and (ii) an investment vehicle controlled by Kotick and Kelly would purchase the remaining third for $3 billion at the same price per share. Kotick and Kelly stated that they were "highly confident" that they could raise the money. They attached a letter from Leonard Green expressing its willingness to invest up to $1 billion in their vehicle.

At a Board meeting on February 14, 2013, Kotick informed the independent directors about the proposal and asked that the Board form a special committee (the "Committee") to oversee the transaction process. JP Morgan delivered a presentation

advising that Activision could support up to $5.88 billion in debt and maintain a B+ bond rating. Activision had no debt at the time, so the full amount could be used to repurchase shares from Vivendi.

The Board formed the Committee, comprising directors Corti, Morgado, and Sarnoff. The resolution creating the Committee gave it broad authority, including the ability to contact potential investors and to explore, initiate, and negotiate alternative transactions. The resolution provided that the Committee would remain in existence "until such time as the full Board concludes that no Potential Transaction is likely to occur or the existence of the Committee is no longer required." The Committee retained Centerview Partners, LLC ("Centerview") as its investment advisor.

During a meeting on March 18, 2013, the Committee resolved to

> take care that in pursuing the proposed transaction to eliminate the current control shareholder (*i.e.,* [Vivendi]), it should not create another shareholder or shareholder group with control or elements of control over the Company nor should it put the Company in a position where a new shareholder or shareholder group could exercise influence to the disadvantage of other shareholders.

Through Centerview, the Committee learned that Vivendi was open to disposing of part of its stake through a secondary offering and retaining a small position in Activision.

On April 3, 2013, Centerview recommended preliminarily that Activision repurchase Vivendi's controlling interest. Centerview observed that if Activision borrowed $5.9 billion and used its overseas cash, a full buyout of Vivendi would require only $2 billion of additional capital. Centerview believed that Activision could raise $1 billion of public equity and $2 billion from convertible securities. Centerview advised

6

that Kotick and Kelly's proposal ran the risk that "a strong minority will have disproportionate influence in [the] Board room and [in] shareholder votes." Vivendi's willingness to pursue a secondary offering and retain a small position in Activision made it feasible for Activision to accomplish a restructuring without Kotick and Kelly.

On April 29, 2013, the Committee approved a proposal for Activision to repurchase $5.9 billion of Vivendi's stake at $13.15 per share, with the balance of Vivendi's shares to be addressed by one or more of the following methods: (i) a secondary offering, (ii) a sale to an entity controlled by Kotick and Kelly, or (iii) retention by Vivendi under appropriate governance arrangements. On May 2, the Committee discussed Kotick and Kelly's proposal and expressed the view that "a transaction should not create a new shareholder or shareholder group with control or substantial elements of positive or negative control over the company."

On May 7, 2013, Kotick met with Centerview. Kotick argued that a secondary offering would hurt Activision's stock price. This assertion was contrary to Centerview's view. It also conflicted with what Centerview understood to be the opinion of JP Morgan, the Company's financial advisor who was now assisting Kotick and Kelly, as well as the opinions of Goldman Sachs and Barclays, who were advising Vivendi. Kotick opposed discussing Activision's debt financing capacity with credit agencies, citing the risk of leaks. Centerview disagreed. Kotick also argued that his proposal offered Vivendi the most efficient tax structure. This was contrary to what the Committee understood Vivendi's view to be. In addition to his discussions with Centerview, Kotick called the Committee's legal counsel and objected to the governance terms that the Committee

7

wanted, including a cap on Kotick and Kelly's voting power at 9.9%.

In mid-May 2013, Vivendi told the Committee that it wanted to proceed quickly with either Kotick and Kelly's proposal or with a transaction involving a secondary offering. Vivendi informed the Committee that otherwise it would "engage in self-help." Certain governance restrictions on Vivendi would expire on July 9, making Vivendi's threat credible. Kotick contemporaneously told the Committee that a secondary offering was not feasible, and the Committee members became concerned that Kotick might resign if they did not support a deal on his terms. JP Morgan backed Kotick, telling Centerview that it would not lend if Kotick resigned. JP Morgan later became a joint lead arranger and bookrunner to ASAC.

On May 16, 2013, Kelly told the Committee that he and Kotick had dropped out of the transaction process. Meanwhile, Vivendi told Centerview that if no deal was reached by the end of the week, Vivendi would cause the Board to disband the Committee and move forward with a debt-financed special dividend.

On May 25, 2013, the Committee discussed Kotick and Kelly's positions and decided that a debt or equity offering "would not be actionable" without Kotick's support. The Committee again discussed the risk that Kotick would resign if Activision agreed to a transaction he did not like, as well as JP Morgan's refusal to finance a deal without Kotick. To avoid a special dividend—the worst possible outcome for Activision's unaffiliated stockholders—the Committee asked Vivendi to propose a transaction that included Kotick and Kelly.

On May 30, 2013, Vivendi expressed its support for any one of three alternatives:

- A purchase by Activision of $5.9 billion of Vivendi's shares at $13.60 per share with ASAC buying the rest at $14.80 per share.

- A purchase by Activision of all but $500 million of Vivendi's shares at $13.60 per share with Kotick and Kelly personally buying the remaining $500 million at $13.60 per share.

- A debt-financed special dividend.

The Committee provided these options to Kotick and told him that if he and Kelly did not pick one of them, then the Committee would have to decide between proceeding without them and disbanding. Kotick rejected all three and insisted on a transaction in which ASAC would acquire 24.9% of Activision's outstanding shares for $13.60 per share. Kotick stated that he would not cooperate with a debt or equity offering or any other transaction and that the Board could fire him if they wished.

In light of Kotick's ultimatum, the Committee concluded that Activision's only actionable choice was to give in. The Committee proposed to move forward as Kotick wanted, but to cap ASAC's voting rights at 19.9%. Kotick and Kelly rejected the cap and told the Committee that they would not participate except on their terms.

The Committee members determined that they could not support the repurchase structure without a cap on ASAC's voting rights at 19.9%. They sent a letter to Vivendi and ASAC suggesting that those parties negotiate directly between themselves.

On June 2, 2013, Vivendi sent a letter to the Committee that contemplated Activision buying $5.4 billion of Vivendi's shares at $13.60 per share with Kelly and Kotick personally buying shares worth $500 million at the same price. This reprised the second choice from Vivendi's list of three options. Because Kotick and Kelly would not

support any deal except their own, the Committee did not respond to Vivendi.

At a Board meeting on June 6, 2013, Corti proposed disbanding the Committee, and the Board did so. Contrary to the resolution establishing the Committee, it did not disband because "no Potential Transaction [was] likely to occur or the existence of the Committee is no longer required." Given Vivendi's liquidity needs, a potential transaction remained a virtual certainty, just not on terms the Committee believed at the time that it could accept.

After the disbanding of the Committee, Vivendi negotiated with Kotick and Kelly. On July 9, 2013, they agreed on a term sheet that specified the number of shares that Activision would buy, the number of shares that ASAC would buy, and the purchase price—a 10% discount to market.

With the terms set, the Board reconstituted the Committee on July 11, 2013. The revivified Committee made some slight tweaks to the deal, including obtaining a term in a stockholders agreement between ASAC and Activision (the "Stockholders Agreement") that capped the voting power that Kotick and Kelly could exercise directly at 24.9%. The Committee recommended the deal to the Board, and the Board approved it.

**D.      Activision, Vivendi, And ASAC Announce The Restructuring.**

On July 25, 2013, Activision, Vivendi, and ASAC entered into the transaction agreement that governed the Restructuring (the "Stock Purchase Agreement"). In one major part of the transaction, ASAC agreed to purchase 171,968,042 shares of Activision common stock from Vivendi at $13.60 per share. The price represented a discount of 10% from to Activision's closing stock price on July 25, 2013.

10

In the other major part of the transaction, Activision purchased the shares of Amber Holdings Subsidiary Co. ("Amber"), a newly formed subsidiary of Vivendi. Through a series of mergers called for by the Stock Purchase Agreement, Amber came to own 428,644,513 shares of Activision common stock and net operating losses ("NOLs") worth $676 million. In the Restructuring, Activision purchased the shares of Amber in exchange for $5.83 billion in cash.

Activision indisputably received significant benefits from the Restructuring. Amber brought NOLs worth $676 million, and Activision was able to purchase 428,644,513 shares of its common stock at 10% below the market price. That deal was even better than it sounded, because everyone expected that Activision's stock price would rise after the announcement of the transaction and its separation from cash-strapped Vivendi. It did. Activision's stock price closed at $17.46 per share on Friday, July 26, and at $18.27 per share on Monday, July 29. Equity analysts identified many positive aspects of the Restructuring, including (i) earnings accretion due to the favorable purchase price; (ii) the elimination of Vivendi's majority stake; (iii) the signaling effect of Kotick, Kelly, and Activision's Chinese strategic partner Tencent Holdings Limited ("Tencent") investing in Activision; (iv) Activision's lowered cost of capital from issuing debt; and (v) Activision's eligibility for inclusion in the S&P 500.

The problem with the transaction was not the lack of benefit to Activision, but rather the extraordinary benefits that Kotick and Kelly extracted for themselves. On the financial front, Kotick and Kelly invested $100 million in ASAC GP; ASAC's various co-investors provided over $1.62 billion. Under ASAC's limited partnership agreement,

the returns to ASAC GP were tied to the overall gains on ASAC's $2.3 billion investment in Activision. ASAC's immediate unrealized gain at closing was $712.8 million, of which Kotick and Kelly's share was $178 million. Over the potential four-year lifespan of ASAC, Kotick and Kelly had enhanced upside and a protected downside:

- They would double their money if Activision's stock price remained at the post-announcement price of $17.46 per share.

- They would make nine times their money if Activision's stock price doubled from the post-announcement price to $35 per share.

- They would lose nothing if Activision's stock price declined by 20% from its post-announcement price.

An illustration prepared by Kotick and Kelly's bankers for ASAC's outside investors projected that if ASAC liquidated on the third anniversary after the Restructuring, and ASAC sold its Activision shares for $27 per share, then Kotick and Kelly would receive profits of $586 million, or 5.9 times their invested capital for an IRR of 80.3%. Their co-investors in ASAC would receive 2.1 times their invested capital for an IRR of 28.4%.

On the control front, Kelly continued after the Restructuring as Chairman, and Kotick continued as CEO. They also served as managers of ASAC GP, giving them control over ASAC's entire block of shares. Kotick beneficially owned approximately 5.5 million shares, or roughly 0.8% of Activision's stock, and Kelly beneficially owned approximately 3.3 million shares, or roughly another 0.5%. Kotick and Kelly thus had direct control over shares representing 26% of Activision's voting power, although the Stockholders Agreement capped what they could exercise directly at 24.9%. Two of the principal investors in ASAC were funds affiliated with Davis Selected Advisors, L.P.

12

("Davis"), which invested $350 million, and Fidelity Management & Research Co. ("Fidelity"), which invested $542 million. As of September 30, 2013, funds affiliated with Davis owned over 21 million shares of Activision stock, representing a 3.1% stake, and funds affiliated with Fidelity owned approximately $52 million shares, for a roughly 7.4% stake. Consequently, upon the closing of the Restructuring on October 11, the co-investors in ASAC and their affiliates controlled approximately 35.4% of Activision's voting power.

Kotick and Kelly also enhanced their control at the Board level. Section 3.01(a) of the Stockholders Agreement imposed a series of standstill restrictions on ASAC. In addition to specific limitations in other subsections, subsection 3.01(a)(iv) stated that ASAC shall not, directly or indirectly,

> otherwise act, alone or in concert with others, to seek representation on or to control or influence the management, Company Board or policies of the Company or to obtain representation on the Company Board of Directors (other than with respect to the nomination of Mr. Kotick and Mr. Kelly to the Company Board, as determined by the Company Board in the ordinary course).

The Stockholders Agreement only became effective upon the closing of the Restructuring, which was not expected to occur until the end of September.

After the Stockholders Agreement was finalized but before it became effective, Kotick arranged for Nolan and Elaine Wynn to join the Board. As noted, Nolan was the Managing Partner of Leonard Green, whom Kotick and Kelly had approached privately about their bid and who had backed their original offer to Vivendi. Leonard Green invested in ASAC. Nolan's colleagues at Leonard Green objected to him joining the

13

Board, because one of the premises of Leonard Green's involvement in the Restructuring had been that the firm could trade in Activision stock and hedge their investment in ASAC. Having Nolan on the Board limited Leonard Green's ability to trade and hedge, but Leonard Green valued its relationship with Kotick and Kelly. One of Nolan's partners observed that the "[m]ain reason to even consider [joining the Board] is if Bobby/Brian really want it." Nolan agreed to join.

Wynn was a longtime friend of Kotick whose personal relationship with Kotick rose to the level of an immediate family member. Kotick's relationship with Wynn dated back to 1982, when Kotick was a college sophomore trying to launch a computer company. Kotick pitched his business venture to Wynn and her then-husband, casino mogul Steve Wynn, at a social event in Dallas. The Wynns invited him to their home and then flew him back to the east coast on their private plane. Steve Wynn viewed Kotick as a "potential son-in-law" and protégé. He financed Kotick's startup without signing a written contract, telling Kotick, "We're family now." Although the startup failed, Kotick's relationship with the Wynns deepened. In a 2008 interview, Kotick stated:

> Of all the things that could have happened in my life, meeting the Wynns was probably about the most fortunate. Not just in the way you get a second set of parents—my parents were divorced, so the Wynns came with none of the guilt—but watching what he accomplished.

Kotick refers to Wynn as "Uncle Steve" and has said Wynn is "like my dad." Kotick makes a point of buying a Mother's Day gift for Elaine Wynn, just as he does for his mother and his wife. Wynn agreed to join the Board.

14

By securing Nolan and Wynn's service on the Board, Kotick and Kelly increased their influence in the boardroom. Without Nolan and Wynn, the post-Restructuring Board would have consisted of Kotick, Kelly, and the three individuals who served on the Committee, resulting in a 3-2 majority of independent directors. Nolan and Wynn added two directors with close ties to Kotick who could be viewed as not independent and who might be expected to favor management, giving Kotick and Kelly a 4-3 majority.

**E.     Pacchia Obtains Books And Records, Then Files A Derivative Action.**

Pacchia learned of the Restructuring through Activision's public filings and was disturbed by Kotick and Kelly's role in the transaction. He contacted Bragar Eagel & Squire, P.C. ("BE&S") and used Section 220 of the Delaware General Corporation Law (the "DGCL") to obtain books and records relating to the Restructuring.

On September 11, 2013, Pacchia filed a derivative action. Rosenthal, Monhait & Goddess, P.A. served as Delaware counsel. BE&S served as forwarding counsel. Because Pacchia's complaint relied on confidential information obtained using Section 220, it was filed under seal.

Pacchia's complaint alleged that the individual defendants and Vivendi breached their fiduciary duties to Activision, committed acts of waste, and caused Kotick, Kelly, and Vivendi to become unjustly enriched. Based on the Section 220 production, the complaint alleged that Kotick vetoed a transaction structure in which Vivendi would sell any shares that Activision did not buy in a secondary offering, rather than to ASAC. The complaint also alleged that the Board dissolved the Committee on June 8, 2013, clearing

15

the way for Kotick and Kelly to negotiate terms directly with Vivendi. Pacchia did not file an injunction application or seek an expedited schedule.

**F.      Hayes Files A Class And Derivative Action.**

Also on September 11, 2013, Hayes filed a separate action. Prickett, Jones & Elliott LLP served as Delaware counsel. Kessler, Topaz, Meltzer & Check, LLP, served as forwarding counsel. Hayes framed his lawsuit as both a derivative action and a class action. Hayes had not used Section 220 to obtain books and records from Activision, so his complaint relied solely on publicly available information. He included claims similar in form to Pacchia's, including (i) breach of fiduciary duty against Vivendi and the Activision directors, (ii) usurpation of a corporate opportunity by Kotick, Kelly, and ASAC, and (iii) aiding and abetting against various other defendants.

What distinguished Hayes' complaint was a theory that the Restructuring required a stockholder vote. Section 9.1(b) of Activision's certificate of incorporation stated:

> Unless Vivendi's Voting Interest (i) equals or exceeds 90% or (ii) is less than 35%, with respect to any merger, business combination or similar transaction involving the Corporation or any of its Subsidiaries, on the one hand, and Vivendi or its Controlled Affiliates, on the other hand, in addition to any approval required pursuant to the DGCL and/or the Corporation's by-laws, the approval of such transaction shall require the affirmative vote of a majority in interest of the stockholders of the Corporation, other than Vivendi and its Controlled Affiliates, that are present and entitled to vote at the meeting called for such purpose.

Hayes alleged that the Restructuring constituted a "merger, business combination or similar transaction involving [Activision] or any of its Subsidiaries, on the one hand, and Vivendi or its Controlled Affiliates, on the other hand," bringing it within the ambit of Section 9.1(b). This decision refers to that theory as the Voting Right Claim.

16

## G.    The Injunction Ruling

Simultaneously with the filing of his complaint, Hayes moved for a temporary restraining order that would prevent the defendants from consummating the Restructuring until the court had an opportunity to hear an application for preliminary injunction. Hayes sought injunctive relief solely on the Voting Right Claim. Hayes moved for an expedited hearing in light of Activision's public disclosure that the Restructuring would close by the end of September 2013. After Hayes filed suit, the defendants advised Hayes that they planned to close on September 19.

On September 18, 2013, the court heard the TRO application. At the conclusion of the hearing, the court issued a thirty-six-page bench ruling granting the application. To facilitate prompt appellate review, the court indicated that it would certify the ruling for interlocutory appeal. The defendants' prepared the pertinent papers, and this court certified its order. The Delaware Supreme Court accepted the appeal.

## H.    The Case Almost Settles.

While the parties were briefing the interlocutory appeal, Hayes pursued settlement discussions with the defendants. On October 7, 2013, Hayes circulated a draft memorandum of understanding for a proposed settlement (the "Draft MOU"). In return for a global release of all claims relating to the Restructuring, (i) Activision would make a special distribution to its public stockholders of shares of common stock with a market value of $70 million and (ii) Vivendi would pay $15 million to the public stockholders. The Draft MOU also contemplated therapeutic relief in the form of nineteen cosmetic changes to Activision's bylaws. None constituted a meaningful benefit for purposes of

17

the settlement. The Draft MOU likewise included a commitment by Activision to propose charter amendments. The proposals eliminated provisions tailored to Vivendi's majority ownership which no longer made sense after the Restructuring. None of those constituted a meaningful benefit either.

Hayes invited Pacchia to sign onto the Draft MOU. Pacchia elected not to sign. On October 8, 2013, Hayes circulated a draft emergency motion to consolidate the pending actions, appoint Hayes as lead plaintiff, and designate his lawyers as lead counsel. The purported exigency was the need to finalize the Draft MOU.

On October 9, 2013, the day before oral argument before the Delaware Supreme Court, Hayes told Pacchia that the defendants would not sign unless he did. Hayes implored Pacchia to reconsider, reasoning as follows:

> If we lose [the appeal], the settlement will be off, our leverage will dissipate, and we will move forward with the litigation. If we win [the appeal], the settlement will be off, the company will hold a shareholder vote, and we believe the shareholders may well approve the transaction. This will give defendants a potential ratification defense in the litigation moving forward, and we believe will make it very hard to extract any consideration through settlement or trial.

Pacchia reluctantly signed on.

Hayes' counsel also tried to convince the law firms of Levi & Korsinksy LLP and Smith Katzenstein & Furlow LLP to sign the Draft MOU. They represented Pfeiffer, who had sent Activision a Section 220 demand in September 2013, after Hayes and Pacchia filed suit. Pfeiffer's demand remained outstanding when Hayes' counsel circulated the Draft MOU. Pfeiffer later would file a Section 220 action, only to dismiss it after Activision disputed whether he actually owned any stock.

18

On October 10, 2013, the Delaware Supreme Court heard argument in the interlocutory appeal. Later that day, the court entered the following order:

> IT IS HEREBY ORDERED that the Court unanimously concludes that the Court of Chancery's judgment must be REVERSED. We hold that there is no possibility of success on the merits. The Stock Purchase Agreement here contested is not a merger, business combination or similar transaction. An Opinion will follow in due course.

*Activision-Blizzard, Inc. v. Hayes*, No. 497, 2013 (Del. Oct. 10, 2013). The Delaware Supreme Court's ruling established that there was no merit to the Voting Right Claim. As Hayes predicted, the defendants' victory rendered the Draft MOU a dead letter.

## I.     The Leadership Fight

On remand, both Hayes and Pacchia filed amended complaints. Both pleadings asserted class and derivative claims. Both complaints were considerably more detailed than their original efforts, because during the short time that this court's injunction remained in effect, Activision filed a preliminary proxy statement with the SEC. The proxy statement provided insight into the background of the Restructuring, and both Hayes and Pacchia relied on its contents. Pacchia continued to rely on additional, non-public information that he obtained by using Section 220.

The court consolidated the two actions, and a leadership fight ensued. To bolster his litigation team, Pacchia hired what was then the firm of Bouchard, Margules & Friedlander, P.A., subsequently Friedlander & Gorris, P.A. ("F&G"). After hearing presentations from both sides, the court found little to distinguish between the named plaintiffs or their legal teams. Neither Hayes nor Pacchia owned a significant equity stake. Pacchia was marginally more qualified by profession and experience to serve as a

fiduciary in representative litigation, but not to a dispositive degree. Both sets of law firms were highly competent and capable. Both legal teams had track records demonstrating their ability to obtain excellent results in representative litigation.

As a tiebreaker, the court turned to the Delaware Supreme Court's ruling on appeal. That decision taught that Hayes had pursued the wrong legal theory and acted to the detriment of Activision and its stockholders by pursuing the Voting Right Claim. Because the Delaware Supreme Court had determined that the claim was meritless, Hayes' efforts erroneously placed the closing of the Restructuring at risk. Pacchia, by contrast, had followed what the Delaware Supreme Court had determined was the correct course by not seeking injunctive relief and permitting the Restructuring to close. Given the implications of the Delaware Supreme Court's ruling, the court designated Pacchia as the Lead Plaintiff and his counsel as Lead Counsel.

This ruling did not sit well with Hayes or his counsel—and understandably so. From their perspective, they were on the verge of a settlement worth $85 million that could have supported a fee award of $10-20 million. A month later, they found themselves empty handed and on the sidelines. Revealing how they perceived the events, their brief remonstrates that "Hayes and his counsel were essentially thrown out of the case." Dkt. 352 at 14.

## J.     Lead Counsel Press Forward.

Immediately after the leadership hearing, Lead Counsel filed a second amended class and derivative complaint. Lead Counsel served document requests and subpoenas and proposed a scheduling order that would allow the case to be tried in 2014. Two

disputes immediately arose. The defendants did not want trial to occur until April 2015 at the earliest, and Vivendi argued that its electronic documents were exempt from discovery. Pacchia prevailed on both issues. These rulings allowed the case to proceed on a prompt schedule with trial set for December 8-12, 2014.

**K.      Smith Katzenstein And Levi & Korsinsky Try Again To Carve Out A Role.**

On March 14, 2014, Smith Katzenstein and Levi & Korsinsky filed a complaint on behalf of Benston. This was their second try, having first appeared with Pfeiffer. After using Section 220 to obtain books and records, Benston filed a lengthy complaint which, in substance, resembled the publicly available Hayes complaint. Benston's principal contribution was to reframe the core breach of fiduciary duty allegations as a claim for insider trading under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949). Lead Counsel had not pled a *Brophy* claim. Lead Counsel believed the theory was meritless given that the Restructuring was negotiated by Activision fiduciaries with equivalent access to confidential information.

Benston's counsel sought to be added to the leadership structure for the limited purpose of pursuing the *Brophy* claim. The court consolidated the new action and held a second leadership hearing. The court declined to give Benston's counsel a role, finding no reason to balkanize control over the case and concluding that Lead Counsel was capable of providing adequate representation and asserting the *Brophy* claim if warranted.

**L.      The Third Amended Complaint**

Meanwhile, Lead Counsel obtained leave to file a third amended and supplemental complaint that took into account the early fruits of document discovery. The defendants

moved to dismiss pursuant to Rule 12(b)(6). On June 6, 2014, after full briefing and oral argument, the court denied the motion. The only exception was a derivative claim for breach of the Stockholders Agreement, which the court dismissed without prejudice. On June 20, Lead Counsel filed an amended complaint that re-pled that count. A motion to dismiss the re-pled claim remained under submission when the case settled.

During fact discovery, Lead Counsel obtained and reviewed over 800,000 pages of documents and deposed twenty-three fact witnesses. To assist in case analysis and to serve as a potential expert, Lead Counsel retained J.T. Atkins of Cypress Associates LLC, an investment banking firm that provides litigation consulting services. After the close of fact discovery, Atkins submitted a lengthy expert report supporting Lead Counsel's damages claims.

The damages report focused on feasible transactional alternatives that faithful fiduciaries should have pursued in lieu of the Restructuring. The alternatives were mutually exclusive, presented different risks, and implied different forms of relief.

The leading alternative (labeled the Over-the-Wall Transaction) was for Activision to solicit direct equity investments, use the funds to repurchase additional shares from Vivendi at $13.60 per share, and then sell the newly repurchased shares at a higher price per share to the participating investors in a simultaneous closing. Atkins opined that the investors should have been willing to pay Activision more than $13.60 per share, and perhaps as much as $17 per share, because (i) Activision's stock price was expected to rise above $17 per share upon announcement; (ii) limited partners in ASAC deemed mid-teen internal rates of return to be satisfactory; (iii) limited partners in ASAC effectively

paid more than $13.60 per share, given that a portion of ASAC's returns went to ASAC GP; and (iv) Activision could demand a higher effective price per share than could ASAC, because limited partners in ASAC had to lock up their shares for four years. Atkins identified precedents for the Over-the-Wall Transaction, including a transaction in 2012 when Alibaba Group repurchased a block of its shares from Yahoo! at $13.54 per share, financed in part by a simultaneous sale of shares to investors at $15.50 per share.

A second alternative was a series of secondary offerings by Vivendi, similar to what Vivendi had proposed. Activision would not profit from this alternative. The unaffiliated stockholders, however, would benefit, since Vivendi's control block would become widely dispersed.

A third alternative was a hybrid between the Over-the-Wall Transaction and secondary offerings, consistent with the three-part transaction structure outlined by JP Morgan in January 2013. Activision would solicit direct investment for some shares and facilitate a series of smaller secondary offerings by Vivendi.

A fourth alternative was a backstopped rights offering to Activision's then-public stockholders (the "Rights Offering"). Atkins opined that at $13.60 per share, the Rights Offering would be fully subscribed, and new stockholders would enjoy the benefits of the expected stock price increase.

Additionally, Atkins opined that Activision could have safely incurred another $500 million in debt to purchase additional shares from Vivendi, which would have increased the earnings-per-share accretion and Activision's stock price. This in turn

23

would lead to greater damages from the failure to pursue the Over-the-Wall Transaction, a hybrid alternative, or the Rights Offering.

The defendants contested Atkins' opinions and relied on experts of their own. Paul Gompers opined that Kotick and Kelly's potential returns from ASAC GP were not excessive compared to returns made by general partners in private equity funds (a different industry and different context). Daniel Fischel opined on the largely undisputed ways in which the Restructuring benefitted Activision. Fischel further opined that Kotick and Kelly's investment in ASAC better aligned senior management's interests with those of Activision and signaled management confidence in Activision's prospects. Fischel also questioned the feasibility of Atkins' transactional alternatives. Bradford Cornell opined that borrowing $500 million to buy additional shares from Vivendi would raise Activision's cost of equity.

## M.    The Settlement

The Settlement arose out of a mediation conducted by former United States District Court Judge Layn Phillips. The first session was held in Newport Beach, California on July 11, 2014, after the denial of the motion to dismiss, the production of documents by parties and non-parties, and several depositions. Lead Counsel had not yet undertaken any damages analysis, but knew the extent of ASAC's immediate and subsequent gains. The mediation ended without a settlement.

The mediation resumed on October 28, 2014, in Newport Beach, with another session planned for November 6, and a potential follow-up session on November 8. The November 6 session ended without sufficient progress to justify the follow-up session.

On November 10, 2014, Judge Phillips made a series of telephone calls about a potential global resolution. On November 13, the parties agreed to the principal terms of the Settlement. Lead Counsel and Activision publicly announced the basic terms after the markets closed on November 19. Media outlets picked up the news.

On December 19, 2014, the parties filed a stipulation of settlement. Dkt. 333 (the "Stipulation"). As noted, the consideration consisted of three principal components:

- A payment of $275 million to Activision ($67.5 million from Vivendi; some portion from insurers; the remainder (at least $150 million) from ASAC).

- A reduction in the cap on Kotick and Kelly's voting power from 24.9% to 19.9%.

- The expansion of the Board by two spots to be filled by individuals independent of and unaffiliated with ASAC, Kotick or Kelly, or any limited partner of ASAC.

Vivendi and the insurers will make their payments to Activision within fifteen days after entry of a judgment approving the Settlement. ASAC will make its payments ten business days after the final disposition of any appeal. The reduction in the cap on Kotick and Kelly's voting power will take effect within ten days after entry of judgment. The expansion of the Board will occur on or before July 31, 2015.

**N.      Hayes Objects To The Settlement.**

When Lead Counsel presented the Settlement for court approval, Hayes re-emerged as an objector. In an initial motion challenging the procedures for considering the Settlement, Hayes complained that he could not access Lead Counsel's brief, which was filed confidentially, or the confidential exhibits that Lead Counsel submitted. The parties agreed to a stipulation that permitted Hayes to access the materials.

In his formal objection to the Settlement, Hayes advanced the numerous arguments that are the principal subject of this decision. Pfeiffer and Benston resurfaced as well. On behalf of their counsel, they petitioned for an award of fees and expenses on the theory that their counsel contributed to the Settlement.

## II.    LEGAL ANALYSIS

The settlement of a class or derivative action requires court approval. *See* Ct. Ch. R. 23(e) & 23.1(c). "The law, of course, favors the voluntary settlement of contested issues." *Rome v. Archer*, 197 A.2d 49, 53 (Del. 1964). The settlement of representative litigation, however, "is unique because the fiduciary nature of the [litigation] requires the Court of Chancery to participate in the consummation of the settlement . . . ." *Prezant v. De Angelis*, 636 A.2d 915, 921 (Del. 1994). The potential divergence between the personal interests of the attorneys conducting the litigation and the interests of the class or corporation they represent means that "the Court of Chancery must . . . play the role of fiduciary in its review of these settlements . . . ." *In re Resorts Int'l S'holders Litig. Appeals*, 570 A.2d 259, 266 (Del. 1990). In carrying out this role, the court "must balance the policy preference for settlement against the need to insure that the interests of the class [or corporation] have been fairly represented." *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1283 (Del. 1989).

The tasks assigned to the court include (i) confirming that the Settlement is properly structured, (ii) ensuring that adequate notice has been provided, (iii) assessing the reasonableness of the "give" and the "get," as well as the allocation of the "get" among various claimants, (iv) approving an appropriate award of attorneys' fees, and (v)

26

authorizing any payment from the fee award to the representative plaintiff. Hayes has raised issues under each heading. Pfeiffer and Benston have piped in on the fourth, and the defendants have joined Hayes in complaining about the fifth.

## A. The Common Theme Underlying Hayes' Objections

Hayes has advanced numerous objections under multiple headings, but they depend on a common premise. Hayes believes that the "public stockholders who held during the pendency of the [Restructuring] (*i.e.*, between the announcement of the [Restructuring] on July 25, 2013 and the consummation of the [Restructuring] on October 11, 2013)" have valuable damages claims, belonging to them personally, that are being released in the Settlement for no consideration. Dkt. 352 at 27.

Critical to Hayes' objections is his perception that there are strong damages claims that *belong personally* to all stockholders who held shares at any time during the relevant period. Given what he believes to be the personal nature of these claims, Hayes contends that stockholders who sold their shares *did not transfer* their right to pursue their personal claims and receive the benefit of any recovery. As he sees it, the personal claims remained with the former holders. Indeed, from Hayes' standpoint, these are the persons for whom the Settlement is most problematic. Stockholders who continue to hold their shares through the consummation of the Settlement at least benefit indirectly from the consideration that the Settlement provides. But those who sold receive nothing in the Settlement for the claims that Hayes believes they still possess. Because the persons whose interests Hayes most vigorously champions were sellers, this decision refers to them as the "Seller Class."

Under Hayes' approach, the number of persons in the Seller Class could be vast. Millions of Activision shares trade each day. Hayes thinks anyone who bought shares after July 25, 2013, but before October 11, 2013, obtained personal claims. A day trader who purchased shares on the morning of Friday, July 26, and sold that afternoon is part of the Seller Class. So is any high frequency trader who held shares for a microsecond.

Hayes argues that the personal claims held by members of the Seller Class include the strong causes of action under Delaware corporate law that Lead Counsel pursued and which led to the Settlement. Because this position is fundamental to each of his objections, it is worth addressing at the outset. In my view, Hayes is wrong.

The Delaware corporate law claims that Lead Counsel pursued and which formed the basis for the Settlement fall into three categories: (i) corporate claims belonging to Activision that Lead Counsel litigated derivatively; (ii) stockholder claims associated with the rights carried by shares of Activision common stock that Lead Counsel litigated directly, and (iii) dual-attribute claims having features of both direct and derivative claims, which Lead Counsel asserted both directly and derivatively to cover both bases. For each category, the right to assert the claim and benefit from any recovery is a property right associated with the shares. By default, that property right travels with the shares. By selling their shares, the members of the Seller Class defeased to their purchasers any right they had to bring or benefit from these claims. In doing so, the members of the Seller Class "made a conscious business decision to sell their shares into a market that implicitly reflect[s] the value of the pending and any prospective lawsuits." *In re Resorts Int'l S'holders Litig.*, 1988 WL 92749, at *10 (Del. Ch. Sept. 7, 1988);

28

*accord In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at \*4 (Del. Ch. July 26, 2002).

There are admittedly theoretical causes of action under the expansive rubric of American law that members of the Seller Class hold personally and which the Settlement will release. The most obvious category is claims under the federal securities laws. But to foreshadow the analysis of the adequacy of the Settlement and the reasonableness of the allocation of consideration, no one (including Hayes) has meaningfully articulated any personal claims or shown them to have any value whatsoever. Under controlling Delaware Supreme Court precedent, a settlement can release claims of negligible value to achieve a settlement that provides reasonable consideration for meaningful claims. *In re Phila. Stock Exch. Inc. (PHLX I),* 945 A.2d 1123, 1140 (Del. 2008).

### 1. The Derivative Claims

The first category of claims that Lead Counsel litigated comprised causes of action belonging to Activision that were prosecuted derivatively. A corporate claim is an asset of the corporation, so authority over the claim ordinarily rests with the board of directors.[1] The power and authority afforded to directors by Section 141(a) of the DGCL

---

[1] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See id.* at 253 n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 72-73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624-25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Brehm*, 746 A.2d at 254. The

29

"encompasses decisions whether to initiate, or refrain from entering, litigation." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981) (footnote omitted). In limited circumstances, however, a stockholder can assert the corporation's claims derivatively on its behalf. *See Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008).

> The stockholder's derivative suit was created in equity in the first half of the nineteenth century. Its initial purpose was to provide the stockholder a right to call to account his directors for their management of the corporation, analogous to the right of a trust beneficiary to call his trustee to account for the management of the trust corpus.[2]

"Devised as a suit in equity, the purpose of the derivative action was . . . to protect the interests of the corporation from the misfeasance and mal-feasance of 'faithless directors

---

seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. It therefore omits the cumbersome subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Delaware derivative action canon.

[2] *Maldonado v. Flynn*, 413 A.2d 1251, 1261 (Del. Ch. 1980), *rev'd on other grounds sub nom. Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981); *accord Taormina v. Taormina Corp.*, 78 A.2d 473, 475 (Del. Ch. 1951) ("[W]henever a corporation possesses a cause of action which it either refuses to assert or, by reason of circumstances, is unable to assert, equity will permit a stockholder to sue in his own name for the benefit of the corporation solely for the purpose of preventing injustice when it is apparent that the corporation's rights would not be protected otherwise."); *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (Wolcott, Jos., C.) ("Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.10, at 13-24 (3d ed. 2014) ("The fundamental purpose of a derivative action is to enforce a corporate right that the corporation has refused for one reason or another to assert."); 4 John Norton Pomeroy, *Equity Jurisprudence* § 1095, at 278 (Spencer W. Symons ed., 5th ed. 1941) ("The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his*, or because *he* is entitled to the relief sought; he is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court*.") (emphasis in original).

and managers.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

A derivative action under Delaware law joins two suits in one. "The nature of the [derivative] action is two-fold. First, it is the equivalent of a suit by the shareholders to compel the corporation to sue. Second, it is a suit by the corporation, asserted by the shareholders on its behalf, against those liable to it."[3] Only in its second dimension does the derivative action assert a claim belonging to the corporation. In its first dimension, the claim being asserted belongs to the stockholders in their capacities as owners of shares:

> Inasmuch however as the corporation will not sue because of the domination over it by the alleged wrongdoers who are its directors, the complainants as stockholders have a right in equity to compel the assertion of the corporation's rights to redress. This is their individual right. A bill filed by stockholders in their derivative right therefore has two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation, asserted by the stockholders in its behalf, against those liable to it. The former belongs to the complaining stockholders; the latter to the corporation.

---

[3] *Aronson*, 473 A.2d at 811; *accord Schoon*, 953 A.2d at 201-202 (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (citing the "two-fold" nature of the derivative action); *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 n.41 (Del. 1988) ("The normal derivative suit was two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation." (internal quotation marks omitted)); *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del. 1988) (describing the "two-fold" nature of the derivative action); *Zapata*, 430 A.2d at 784 (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit"); *Harff v. Kerkorian*, 324 A.2d 215, 218 (Del. Ch. 1974) ("The nature of the derivative suit is two-fold: first, it is the equivalent of a suit by the stockholders to compel the corporation to sue; and second, it is a suit by the corporation, asserted by the stockholders in its behalf, against those liable to it."), *aff'd in pertinent part*, 347 A.2d 133 (Del. 1975).

*Cantor*, 162 A. at 76. The former action "may be regarded as a 'propulsive' one, to compel in one proceeding the enforcement of the obligation owed by the corporation to the plaintiff and to all its shareholders, to assert its right of action for their benefit." Henry Winthrop Ballantine, *Ballantine on Corporations* § 145 at 344 (Rev. ed. 1946).

Although the derivative action originated to enable stockholders to pursue internal corporate claims against corporate fiduciaries, the logic of the structure was not so limited. The same concepts would facilitate an action to enforce any corporate right that the corporation "has refused for one reason or another to assert." Balotti & Finkelstein, *supra*, § 13.9 at 13-24. "'Any claim belonging to the corporation may, in appropriate circumstances, be asserted in a derivative action,' including claims that do—and claims that do not—involve corporate mismanagement or breach of fiduciary duty."[4]

During the nineteenth century, corporations frequently encouraged stockholders who were supportive of management to assert claims derivatively on the corporation's behalf, including claims for breach of contract, in order to establish diversity jurisdiction in federal court. *See Hawes v. City of Oakland*, 104 U.S. 450, 452-53 (1881).

---

[4] 3 Stephen A. Radin, *The Business Judgment Rule* 3612 (6th ed. 2009) (quoting *Midland Food Servs., LLC v. Castle Hill Hldgs. V, LLC*, 792 A.2d 920, 931 (Del. Ch. 1999) (Strine, V.C.)); *see, e.g.*, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999) (permitting "contract actions brought derivatively by shareholders on behalf of the contracting corporation"); *Slattery v. United States*, 35 Fed. Cl. 180, 183 (1996) (same); *Suess v. United States*, 33 Fed. Cl. 89, 93 (Fed. Cl. 1995) (denying motion to dismiss a derivative claim for breach of contract against the United States); *see also Ross v. Bernhard*, 396 U.S. 531, 542-43 (1970) (holding right to jury trial existed for breach of contract claim asserted by stockholder derivatively because "[t]he corporation, had it sued on its own behalf, would have been entitled to a jury's determination").

> [I]t was not uncommon for a corporation that had a direct claim against a party who was a cocitizen of the state of its incorporation to seek to have the claim litigated in a federal court as a derivative suit brought by a nominal shareholder-plaintiff who was chosen because the shareholder's citizenship was different from that of the corporation and its officers, as well as that of the prospective defendant. *If an accommodating stockholder could not be found, one could be created by transferring stock to an individual whose citizenship enabled that person to bring the suit.*

7 Charles Alan Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 1830 (3d ed. 2007) (emphasis added). In *Hawes*, the United States Supreme Court created the contemporaneous ownership requirement to prevent corporations from manufacturing diversity jurisdiction for claims against third parties. 104 U.S. at 461; *see* Robert C. Clark, *Corporate Law* § 15.4 at 651 (1986) ("Originally the rule was designed simply to deter the buying of shares in order to create diversity of citizenship and thereby gain access to the federal courts.").

The problem of management using a friendly stockholder to manufacture jurisdiction did not confront state courts (and it still doesn't). Consequently, "many courts, including Delaware, did not follow the rule of the *Hawes* case [*viz.*, the contemporaneous ownership requirement]." *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948) (Seitz, V.C.). At common law, the right to sue derivatively passed with the shares, and "in order to maintain a derivative action, a stockholder was not required to be the owner of the shares at the time of the transaction of which he complained." *Id.* at 110 (citing cases). But in 1945, the General Assembly created the contemporaneous ownership requirement for derivative actions by adopting what is now Section 327 of the DGCL. In its current form, it states:

33

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

8 *Del. C.* § 327.

The new provision "effected a substantial change in the Delaware Corporation Law." *Burry Biscuit*, 60 A.2d at 110. Before its adoption, both the right to sue and the right to benefit indirectly from any derivative recovery passed with the shares. After the adoption of Section 327, the right to benefit from a derivative recovery continued to pass with the shares, but the successor holder did not have the right to sue.

The contemporaneous ownership requirement has been the subject of extensive criticism. Professor Clark has written in his respected treatise that if

> a person thinks he has a valid derivative claim against his corporation's directors and officers but is reluctant to start a lawsuit himself—perhaps because he lacks the time or is risk-averse—it would appear to be a good thing, for himself and other shareholders, if he could sell his shares to a more daring investor who is willing to act as prosecutor on behalf of all the shareholders. Thus, it is difficult to justify the continued existence of the contemporaneous ownership requirement.

Clark, *supra*, § 15.4 at 651. At the other end of the temporal spectrum, one of the earliest authors of an American corporate law treatise commented that

> the estate of a corporation is to be treated as that of a continuing institution, irrespective of the members at any particular time composing it. Each share represents an interest in the entire concern, and the several holders are entitled to equal rights irrespective of the time when they acquired their shares. Causes of action belonging to the corporation increase the value of the corporate estate, and must be treated like any other assets; when enforced, they inure to the benefit of all the shareholders without distinction. It is plain, therefore, that a shareholder has an interest in all of

34

the causes of action belonging to the corporation, whether they arose before or after he purchased his shares.

Victor A. Morawetz, *The Law of Private Corporations* § 265 (2d ed. 1886). He continued: "There seems to be no good reason why a shareholder should not, as a rule, be permitted to sue on account of causes of action which arose before he purchased his shares, it being assumed, of course, that the corporation ought to sue but is unable to act." *Id.* § 266.

Intervening treatise authors shared these views. Henry Winthrop Ballantine regarded the contemporaneous ownership requirement as illogical because

> [t]he transfer of shares not only conveys to the transferee the ownership of the shares and the right to the future dividends thereon, but also places him upon an equal footing with the other shareholders—provided neither he nor his transferrer is otherwise estopped—in respect to the right to call the officers and agents of the corporation to account in a derivative suit, or to compel the corporation to assert its rights of action against third parties. A shareholder has an interest in all assets and all causes of action belonging to the corporation, whether they arose before or after he purchased his shares.

Ballantine, *supra*, § 148 at 353. George D. Horstein wrote that "[r]ejection of the contemporaneous ownership doctrine appears logically sound since the shareholder sues in the right of the corporation and the corporation's right should not be affected by the date when shares were acquired by an individual who sets in motion the judicial machinery." 2 George D. Horstein, *Corporation Law & Practice* § 712 at 195 (1959). As

35

in Delaware, a majority of jurisdictions refused to adopt a contemporaneous ownership requirement in the absence of a statute.[5]

For reasons discussed at length elsewhere, I do not believe that a coherent and credible policy justification has ever been offered for Section 327's limitation on the ability of stockholders to assert pre-transfer claims. *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008). The purposes that have been proffered for Section 327's limitation on stockholder standing (i) ignore the two-fold nature of the derivative action, *id.* at 676-77, (ii) conflict with Delaware law on the assignability of claims, *id.* at 680-81, (iii) do not match up with how the statute operates, *id.* at 682-84, 688-91, or (iv) stand in tension with financial and economic theory, *id.* at 685-88. Nevertheless, Section 327 is obviously the law of Delaware, and this court is bound to apply it.

---

[5] *Id.* at 194; *accord* Note, *Negotiability of Shares—Right of Subsequent Transferee To Sue*, 23 Minn. L. Rev. 484, 488 n.30 (1939) (explaining that "a subsequent transferee of shares in a corporation should be able to maintain a derivative suit" and stating that "[t]his appears to be the majority position"); Note, *Stockholder's Suit For Wrong Which Occurred Before Complainant Acquired Stock*, 68 U.S. L. Rev. 169, 169 (1934) (noting that "[i]n most of the jurisdictions in which the question has been presented, it has been held that in the absence of special circumstances a stockholder's suit may be brought by one who was not a stockholder at the time of the transaction of which he complains"); *see id.* at 172-75 (drawing on reasoning of cases to criticize contemporaneous ownership requirement); 6 Seymor D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 4638 at 538 (3d ed. 1927) ("The general rule in the state courts undoubtedly is that the stockholder who pleads a good cause of action may maintain the same, although he was not an owner of the stock at the time the breach of duty was committed . . . ."). For a representative decision rejecting the imposition of a contemporaneous ownership requirement at common law, see *Pollitz v. Gould*, 94 N.E. 1088 (N.Y. 1911).

The question for present purposes is whether by cutting off the right to sue, Section 327 transmutes the lost ability to bring a derivative claim into a personal claim belonging to the selling stockholder such that the Seller Class could have a claim for damages. But for Section 327, it would be clear that both the right to assert the derivative claim and the ability to benefit from any recovery traveled with the shares when they were sold. The plain language of Section 327 only addresses the right to assert the claim. Nothing in Section 327 limits the ability to benefit from any derivative recovery. And achieving that result would be difficult. The recovery in a derivative action belongs to and is almost inevitably awarded to the corporation, so all current stockholders benefit, notwithstanding the contemporaneous ownership requirement. It seems plain to me that to the extent the Seller Class retains personal claims, they do not encompass or derive from the derivative claims that Lead Counsel asserted.

The claim in the case that was most obviously and purely derivative was Count XI of the Complaint, which alleged that ASAC breached the Stockholders Agreement. Count XI alleged that ASAC breached the contractual limit on its Board representation by seeking and obtaining Board seats for Nolan and Wynn. The claim to enforce the Stockholders Agreement belonged to Activision, which was a party to that agreement.

The other claims that the Complaint styled as derivative are more properly viewed as having dual attributes. In Counts VI through X, the Complaint described the alleged wrongs associated with the Restructuring in which the defendants had engaged and framed the theories as derivative claims brought on behalf of Activision. In Counts VI

through X, the Complaint described the same alleged wrongs and framed the theories as direct claims brought on behalf of the Class.

For purposes of evaluating the underlying premise of Hayes' objections, what matters presently is that any right to benefit from the derivative claims belongs to the current holders of shares. Anyone who sold their shares "chose to dissociate their economic interests from the corporation and, by doing so, to forego the opportunity to benefit from . . . the potential benefit to the corporation from the derivative claims." *In re Triarc Cos., Inc. Class & Deriv. Litig.*, 791 A.2d 872, 875 (Del. Ch. 2001). The Seller Class has no right to benefit from the derivative claims.

### 2. Direct Claims

A similar analysis applies to the second category of Delaware corporate law claims, namely the direct claims. Shares of stock carry with them particular rights that a holder of the shares can exercise by virtue of being the owner. A stockholder can invoke these rights directly, rather than derivatively. First Hayes and then Lead Counsel litigated direct claims belonging to holders of Activision common stock.

Direct claims include the causes of action conferred on stockholders by specific statutory provisions of the DGCL.[6] Direct claims also include causes of action to enforce contract rights that stockholders possess under the corporation's certificate of

---

[6] *See, e.g., 8 Del. C.* §§ 168, 205, 211, 219, 220, 223, 225, 226, 262, 273, 291.

incorporation and bylaws,[7] recognizing that the DGCL forms a part of every Delaware corporation's charter.[8] Classic examples included the right to vote, the right to compel payment of a contractually specified dividend, and the right to own and alienate shares.[9] Stockholders similarly can sue directly to enforce contractual constraints on a board's authority under the charter, bylaws, and provisions of the DGCL.[10] The availability of a direct cause of action in these situations comports with the Delaware Supreme Court's longstanding recognition that the DGCL, the certification of incorporation, and the

---

[7] *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1037-39 (Del. 2004); *Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del. Super. Feb. 21, 2011); *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del. Ch. Aug. 23, 2010); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *7, *13-14 (Del. Ch. May 5, 2010); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del. Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del. 2003) (TABLE). As *Tooley* specifically held, stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders had the same right and suffered the same injury. *Tooley*, 845 A.2d at 1039. *See generally Allen v. El Paso Pipeline GP Co., L.L.C.*, 90 A.3d 1097, 1105-1109 (Del. Ch. 2014).

[8] 8 *Del. C.* § 394 ("This chapter and all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company."); *Hartford Acc. & Indem. Co. v. W. S. Dickey Clay Mfg. Co.*, 24 A.2d 315, 321 (Del. 1942) ("[T]here is impliedly written into every corporate charter as a constituent part thereof the pertinent provisions of the State Constitution and statutes."); *Fed. United Corp. v. Havender*, 11 A.2d 331, 338 (Del. 1940) ("It is elementary that these provisions [of the DGCL] are written into every corporate charter.").

[9] *See Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1078-79 (Del. 1986) (right to vote); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 78-79 (Del. Ch. 1999) (Strine, V.C.) (right to own and alienate shares); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del. Ch.) (discussing classic examples), *aff'd*, 500 A.2d 1346 (Del. 1985); *see also Turner v. Bernstein*, 768 A.2d 24, 33 n.20 (Del. Ch. 2000) (Strine, V.C.) (observing that the right to declare or compel a dividend has been recognized as a classic example of an action suitable to certification under Rule 23(b)(1)).

[10] *See Grimes*, 673 A.2d at 1213; *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, *5 (Del. Ch. Aug. 16, 2010).

bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation.[11] As parties to the contract, stockholders can enforce it.[12]

Section 327 does not apply to direct claims. When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares.[13] "This is the general rule embodied in 6 *Del. C.* § 8-303(a), which provides that upon delivery of a . . . security to a purchaser, the purchaser acquires all rights in the security

---

[11] *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013) (Strine, C.) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders . . . ."); *STAAR Surgical*, 588 A.2d at 1136 ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation . . . ."); *cf. Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del. 1930) ("The same rules which govern the construction of statutes, contracts and other written instruments, are made use of in construing the provisions and determining the meaning of charters and grants of corporate powers and privileges.").

[12] *See Grimes*, 673 A.2d at 1212; *Grayson*, 2010 WL 3221951, at *6; *see also Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del. Ch. 1988) (Allen, C.) (noting that the scope of a restriction on a fiduciary's authority is "not . . . a question that a court may leave to the [fiduciary] finally to decide so long as he does so honestly and competently; that is, it may not be left to the [fiduciary's] business judgment").

[13] *Schultz v. Ginsburg (PHLX II)*, 965 A.2d 661, 667 (Del. 2009) ("As a matter of law, a Charter Violation claim transfers to a later purchaser because the injury is to the stock and not the holder."); *Prodigy*, 2002 WL 1767543, at *4 ("[W]hen Beoshanz sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement."); *Triarc*, 791 A.2d at 878-79 (explaining owners of stock who sell their shares are "viewed as having sold their interest in the claim with their shares"); *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001) ("I can see little reason why the claim for breach of the preferred stock charter provisions would not ordinarily transfer with the shares."). *But see Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002) (applying judicially created version of contemporaneous ownership requirement to direct claims as a matter of public policy).

that the transferor had or had power to transfer." *Sunstates*, 2001 WL 432447, at *3

(internal quotation marks omitted). More generally, Delaware has a longstanding rule that

claims are freely assignable and can be asserted by the acquirer if the right of action is the

type of claim that would survive the death of the transferor and pass to his personal

representative. *See Indus. Trust Co. v. Stidham*, 33 A.2d 159, 160-61 (Del. 1942). By

statute, "[a]ll causes of action, except actions for defamation, malicious prosecution, or

upon penal statutes, shall survive . . . ."[14] Direct claims survive and are transferrable.[15]

---

[14] 10 *Del. C.* § 3701. Because Delaware law generally permits parties to acquire and assert claims, and in light of Section 18-303 of title 6, there does not seem to be support for the statement that "Delaware law recognizes a policy against buying a lawsuit." *PHLX II*, 965 A.2d at 668. As the only authority for this proposition, the *PHLX II* opinion cited this court's decision granting a motion to dismiss a bidder's claims for breach of fiduciary duty. *See Omnicare*, 809 A.2d at 1169. The *Omnicare* opinion asserted that before the adoption of Section 327, there was "a longstanding Delaware public policy against the 'evil' of purchasing stock in order 'to attack a transaction which occurred prior to the purchase of the stock.'" *Id.* (quoting *Burry Biscuit*, 60 A.2d at 111). The *Omnicare* opinion also asserted that "[t]he policy against purchasing lawsuits involving the internal relations of Delaware corporations *was codified* in the derivative suit context by [Section 327]." *Id.* (emphasis added). As support, the *Omnicare* decision relied on *Burry Biscuit* and authorities traceable to *Burry Biscuit*. But on both points, *Burry Biscuit* said exactly the opposite. As to the state of the law before the adoption of Section 327, then-Vice Chancellor Seitz wrote: "Under the Delaware Law as it existed prior to the enactment of [Section 327], in order to maintain a derivative action, a stockholder was not required to be the owner of the shares at the time of the transaction of which he complained." *Burry Biscuit*, 60 A.2d at 111. As to the supposed codification of existing law, then-Vice Chancellor Seitz wrote that Section 327 "effected a substantial change in the Delaware Corporation Law." *Id.* The change was that before its passage, a stockholder could sue for wrongs pre-dating the acquisition of stock, but "[a]fter its passage, a stockholder filing a derivative action was required to allege and therefore to prove that he was a stockholder at the time of the transaction of which he complained, or that his stock devolved upon him by operation of law." *Id.* Delaware also did not view a lawsuit brought by an after-acquiring stockholder as champerty—the common law doctrine that guarded against the purchase of a lawsuit, "for champerty cannot be charged against one having an interest in the matter in controversy." *Eshleman v. Keenan*, 181 A. 655, 658 (Del. Ch. 1935) (Wolcott, Jos., C.). Delaware law does not limit the ability of investors in the other half of the corporate capital structure—debt—to assert direct claims that arose before they purchased their securities. Imagine what it would mean for negotiable instruments if an after-acquiring debtholder could not sue for breach. Perhaps *PHLX II* suggests that the Delaware Supreme Court

The claim in this case that was most obviously direct was the Voting Right Claim which the Delaware Supreme Court held was meritless. The other claims styled as direct are better viewed as having dual attributes.

What again matters for present purposes is that the direct claims asserted in this case, along with the right to benefit from any remedy, belong to the current holders of shares. Persons who sold their shares "chose to dissociate their economic interests from the corporation and, by doing so, to forego the opportunity to benefit from . . . the class claims." *Triarc*, 791 A.2d at 872. The Seller Class has no right to pursue or benefit from the direct claims.

### 3. The Dual Claims

The principal claims that Lead Counsel litigated had attributes that permitted them to be pled either as derivative claims or direct claims.[16] Corporate transactions that

---

would recognize that Delaware has a public policy against a stockholder buying property rights that include choses in action, but any such policy should rest on reasons why the law would disfavor the property rights of stockholders relative to those of other similarly situated claimants.

[15] *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *29 (Del. Ch. May 3, 2004, revised June 4, 2004) (Jacobs, J. by designation) ("In this case, the choses in action are breach of fiduciary duty and fraud claims. Those claims survive to (or against) a personal representative under 10 *Del. C.* § 3701."); *accord Puma v. Marriott*, 294 F.Supp. 1116, 1119 (D. Del. 1969) (holding that claim for breach of fiduciary duty survived under Section 3701); *St. Search P'rs, L.P. v. Ricon Int'l, L.L.C.*, 2006 WL 1313859, at *3 (Del. Super. May 12, 2006) ("[C]laims for breach of fiduciary obligations and resultant unjust enrichment have been held to survive").

[16] *See Gatz v. Ponsoldt*, 925 A.2d 1265, 1268 (Del. 2007); ("[T]he claims before us are not exclusively derivative and could be brought directly."); *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006); *Grimes*, 673 A.2d at 1212 ("Courts have long recognized that the same set of facts can give rise both to a direct claim and a derivative claim."); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 2011 WL 3371493, at *5 n.31 (Del. Ch. Aug. 5, 2011) ("Although the *Tooley* formulation provides a two-part analysis for determining whether an

reallocate stock ownership percentages and voting rights often give rise to dual-attribute claims.[17]

---

asserted claim is direct or derivative, there are some limited exceptions where the same facts may support both direct and derivative claims."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 n.68 (Del. Ch. Oct. 28, 2010) ("The same facts may support both direct and derivative claims."); *Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *3 n.28 (Del. Ch. Feb. 20, 2009) ("It is possible for a claim to be both derivative and direct."); *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1181 n.54 (Del. Ch. 2006) (acknowledging the "common sense principle" that the same set of facts can set forth both direct and derivative claims seeking different forms of relief); *Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *3 (Del. Ch. Mar. 27, 1998) ("[I]n some circumstances, the same conduct (or aspects thereof) may give rise to both derivative and direct claims.").

[17] *See Gatz*, 925 A.2d at 1281 (concluding that transaction in which stockholder gained controlling position and public stockholders were diminished to a minority position were not exclusively derivative and could have been brought directly); *Gentile*, 906 A.2d at 90 (discussing dual attribute claims based on expropriation caused by a dilutive stock issuance); *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (discussing direct and derivative claims caused by a dilutive stock issuance); *Robotti & Co., LLC v. Liddell*, 2010 WL 157474, at *6-7 (Del. Ch. Jan. 14, 2010) (noting that claims alleging overpayment and subsequent common stock dilution are typically regarded as derivative but claims alleging that a controlling stockholder caused the corporation to overpay for stock thereby increasing the controllers ownership and decreasing minority stockholders' ownership are direct); *Dubroff v. Wren Hldgs., LLC (Dubroff I)*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("*Gentile* and its progeny make clear that a shareholder's claim can be both derivative and direct in a unique situation: where a controlling shareholder causes the corporate entity to issue more equity to the controlling shareholder at the expense of the minority shareholders."); *Oliver v. Bos. Univ.*, 2006 WL 1064169, at *17 (Del. Ch. Apr. 14, 2006) (characterizing claim alleging equity dilution following a preferred stock issuance as a derivative claim but noting that "[v]oting power dilution may constitute a direct claim, because it can directly harm the shareholders without affecting the corporation, and any remedy for the harm suffered under those circumstances would benefit the shareholders."); *In re JP Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 818 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006) (noting that dilution claims alleging the diminishment of voting power may be considered direct claims "where a significant stockholder's interest is increased at the sole expense of the minority" (quoting *In re Paxson Commc'n Corp. S'holders Litig.*, 2001 WL 812028, at *5 (Del. Ch. July 12, 2001)); *Triarc*, 791 A.2d at 874 (discussing direct and derivative claims resulting from the issuance of cash bonuses and stock options in excess of what was permitted by a stockholder approved compensation arrangement). *See generally* 3 Edward P. Welch et al., *Folk On The Delaware General Corporation Law* § 327.02[A][7] (6th ed. 2015).

Under Delaware law, to determine whether a claim is derivative or direct, a court must consider "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley*, 845 A.2d at 1033. When a transaction reallocates ownership percentages at the stockholder level, the first question in the *Tooley* test can be answered either way. Because the board of directors has exclusive authority to issue stock, *see* 8 *Del. C.* §§ 152-157, shares of stock are deemed an asset of the corporation. Stock is a form of currency that can be exchanged for other forms of currency or used for a variety of corporate purposes, including paying off debts, acquiring assets, compensating employees, or acquiring other entities. If a complaint contends that the corporation received too little for its shares, then in one sense, the injury is suffered by the corporation because it did not receive greater value.[18]

But in another sense, the effects of reallocating ownership are felt at the stockholder level. A stock certificate does not have intrinsic value; it is a piece of paper with ink on it. An electronic book entry has even less physical substance. A share is simply a convenient means of tracking proportionate ownership, and the property rights that shares carry have greater or lesser value depending on the relative and absolute

---

[18] *See, e.g.*, *Gentile*, 906 A.2d at 99 ("[C]laims of corporate overpayment are treated as causing harm solely to the corporation and, thus, are regarded as derivative. The reason . . . is that the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow."); *Dubroff I*, 2009 WL 1478697, at *3 ("[B]ecause the corporation has suffered an injury (inadequate payment for its shares) . . . any recovery would flow to the corporate treasury"); *JP Morgan*, 906 A.2d at 819 (noting that "if the [director] defendants are found liable, the remedy will accrue to JPMC").

percentage of ownership that they represent.[19] Transactions involving stock reallocate power and ownership at the stockholder level. A dilutive issuance that raises the recipient's ownership stake increases that holder's relative power and ownership at the expense of the non-recipients. Because of these stockholder-level effects, sophisticated investors bargain for anti-dilution protection and pre-emptive rights. *See* Joseph W. Bartlett & Kevin R. Garlitz, *Fiduciary Duties In Burnout/Cramdown Financings*, 20 J.

---

[19] Delaware law recognizes this reality in many ways. Delaware case law acknowledges that the owner of a controlling block legitimately can insist on a premium for its shares that is not shared with the remaining stockholders. *See, e.g.*, *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996) (noting a "basic precept[] of corporate law" that "controlling shareholders have a right to sell their shares, and in doing so capture and retain a control premium"); *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994) ("The acquisition of majority status and the consequent privilege of exerting the powers of majority ownership come at a price. That price is usually a control premium which recognizes not only the value of a control block of shares, but also compensates the minority stockholders for their resulting loss of voting power."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1039 (Del. Ch. 2012) (Strine, C.) ("It is, of course, true that controlling stockholders are putatively free under our law to sell their own bloc for a premium or even to take a different premium in a merger."); *Mendel v. Carroll*, 651 A.2d 297, 305 (Del. Ch. 1994) (Allen, C.) ("The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium"). Delaware case law also empowers directors to use defensive measures to limit a party's ability to assemble a controlling block. *See eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 29 (Del. Ch. 2010) (noting proper use of rights plan "to block a creeping takeover"); *Yucaipa Am. Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310, 359 (Del. Ch. 2010) (Strine, V.C.), *aff'd*, 15 A.3d 218 (Del. 2011) (same); *Gaylord Container Corp.*, 753 A.2d at 481 ("The primary purpose of a poison pill is to enable the target board of directors to prevent the acquisition of a majority of the company's stock through an inadequate and/or coercive tender offer"). The DGCL imposes statutory limitations on transactions between a corporation and an interested stockholder, defined as someone beneficially owning 15% or more of the entity's voting power, for three years after the stockholder became an interested stockholder (subject to several exceptions). *See* 8 *Del. C.* § 203. Numerous federal statutes similarly impose consequences based on a stockholder's level of equity ownership. *See, e.g.*, 15 U.S.C. § 78m (requiring "beneficial owners" to disclose the acquisition of beneficial ownership of more than five percent of a company's equity securities within ten days of purchase); *id.* § 78p (treating as an insider "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)").

Corp. L. 593, 595-96 (1995). The answer to *Tooley*'s first question—who suffered the harm (the corporation or the stockholders, individually)—is either and both.

The second question under *Tooley*—who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)—likewise can be answered either way. One remedy is to require the recipient of the increased stake to pay more to the corporation, fixing the harm at the corporate level. Another remedy is to adjust the relative rights of the stock or invalidate a portion of the shares, fixing the harm at the stockholder level.[20]

The principal claims for breach of fiduciary duty and aiding and abetting in this case had dual attributes. In response to first question under *Tooley*—who suffered the harm—the answer could be either Activision or the unaffiliated stockholders. In one sense, Activision was harmed by the Restructuring because the defendants' misconduct prevented Activision from repurchasing a greater percentage of its shares from Vivendi. Rather having Activision buy the shares and benefit all of its stockholders indirectly, ASAC bought them. But in another sense, Activision's unaffiliated stockholders were harmed because they lost the opportunity to have control return to the market. The Committee sought a transaction that would have eliminated Vivendi's control block without a replacement controller. Kotick and Kelly took advantage of Vivendi's situation

---

[20] *See In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *32 (Del. Ch. Sept. 19, 2008) (Strine, V.C.) (reforming the securities purchase agreement to convert the preferred stock into non-voting common stock), *aff'd*, 977 A.2d 867 (Del. 2009); *Linton v. Everett*, 1997 WL 441189, at *7 (Del. Ch. July 31, 1997) (invaliding shares that directors issued to themselves for inadequate consideration).

to engineer a transaction where they emerged with practical control and substantial financial benefits. Only the unaffiliated stockholders suffered this injury. Kotick, Kelly, and ASAC benefitted. Precedent exists that supports characterizing the injury suffered by the unaffiliated stockholders as direct, not derivative.[21]

In response to second question under *Tooley*—who would receive the benefit of any remedy—the answer again could be either Activision or the unaffiliated stockholders. One set of possible remedies would operate at the corporate level and include damages in favor of Activision, disgorgement of the defendants' profits, an order requiring ASAC to transfer its shares to Activision, or a constructive trust over the shares for Activision's benefit. These remedies would have addressed the injury Activision suffered. But another set of possible remedies would operate at the stockholder level, such as an order invalidating some or all of ASAC's shares, a permanent injunction blocking ASAC's ability to exercise some or all of its voting rights, or an order adjusting the voting rights directly. *See*, *supra*, n.20.

For the present purpose of evaluating Hayes' principal objection, the critical question is whether dual-attribute claims travel with the shares. Because both direct and

_____

[21] *See, e.g., Gaylord*, 747 A.2d at 84 (holding that challenges to poison pill and charter and bylaw amendments were individual in nature, because when a board takes actions "that diminish the ability of non-management stockholders to elect a new slate of directors, entertain sales proposals, and to amend the corporation's charter and bylaws, the resulting injury to the non-management stockholders is independent of and distinct from any injury to the corporation" and "is to the stockholders within the corporate structure that have lost relative power, not to the corporation as an entity"); *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1189 (Del. Ch. 1998) (holding challenge to adoption of dead hand poison pill is individual because it involves claimed wrongful interference "with the shareholders' right to elect a new board" and "the right to vote is a contractual right and an attribute of the Toll Brothers shares").

derivative claims travel with the shares, claims that have both attributes also logically travel with the shares. That was the conclusion reached in *Triarc*, where the defendants approved executive compensation awards that violated the terms of a stockholder-approved compensation arrangement. 791 A.2d at 874. The court noted that the wrong gave rise both to derivative and direct claims and held that all of the claims traveled with the shares. *Id.* at 874-75, 878-79.

There is an ambiguous reference in *PHLX II* that could support a different rule. The Court of Chancery had approved a complex settlement comprising both direct and derivative claims, which allocated the per share consideration across a class of stockholders as follows:

> 100% per share to the Continuous Holders; 80% per share to the First Period Buyers; 20% per share to the First Period Sellers; 60% per share to Second Period Buyers; 40% per share to Second Period Sellers; and 20% per share to In and Out Traders who bought in the First Period and sold in the Second Period.

965 A.2d at 666. The Court of Chancery evaluated the strength of the different groups' claims and "found the allocation plan to be a rational assessment of the competing interests." *Id.* Several objectors appealed. Most pertinently, certain sellers argued that they suffered damage because of economic dilution from a challenged stock issuance and should have received a larger allocation. *Id.* at 667.

The Delaware Supreme Court reviewed the Court of Chancery's approval of the allocation under an abuse of discretion standard and found no error. When describing the nature of the economic dilution claim, however, the Delaware Supreme Court deployed inconsistent terminology. Initially, the Delaware Supreme Court stated that "as [the lead

plaintiff] admitted, the Economic Dilution claim was personal [and thus] would remain with the Seller and not transfer to the Buyer." *Id.* at 668. But in the very next paragraph, the Delaware Supreme Court stated that the lead plaintiff "predicted that the Chancellor would likely find the Economic Dilution claim to be derivative" and that, as a result, the objecting sellers "would not be able to recover because the corporation would receive the relief." *Id.* And in *PHLX I*, an earlier decision in the case, the Delaware Supreme Court suggested that the dilution claim was direct, noting that "[i]t is at least arguable that only the Class A shareholders who were the original PHLX seatholders, or their successors in interest, could legitimately claim to have been diluted." 945 A.2d at 1141 n.34.

Given the inconsistent observations in *PHLX I* and *II*, I do not regard *PHLX II* as holding definitively that a dilution claim is personal and remains with the sellers. Other Delaware decisions consistently treat dilution claims as direct, derivative, or both, but never as personal. *See*, *supra*, nn. 16 & 17. Nor does the effect of a dilutive issuance fit with a personal characterization. For the non-recipients, the dilutive issuance affects the holders in proportion to their ownership stake in the corporation. That injury can be regarded as derivative or direct because it has attributes of both, but it is not personal.

In my view, the dual-attribute claims—like the direct and derivative claims—travelled with the shares. The Seller Class has no right to pursue or benefit from them.

### 4. Personal Claims

The foregoing discussion of the direct, derivative, and dual-attribute claims does not mean that an individual holder of shares cannot have personal claims. There simply

were not any advanced or litigated in this case, and Hayes has not relied on any to support his objections to the Settlement.

Quintessential examples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares. One major distinction between these types of claims and the Delaware corporate law claims discussed previously is that for the personal claims, the nature of the underlying property does not matter. The property happens to be shares, but the cause of action is not a property right carried by the shares, nor does it arise out of the relationship between the stockholder and the corporation. For the breach of contract claim, the cause of action arises out of the contract between the buyer and the seller. For the fraud claim, the cause of action arises out of the false representations made by the buyer or seller on which the counterparty relied to her detriment, suffering causally related damages as a consequence. The underlying property could just as easily be land or a car.

A Rule 10b-5 claim under the federal securities laws is a personal claim akin to a tort claim for fraud. The right to bring a Rule 10b-5 claim is not a property right associated with shares, nor can it be invoked by those who simply hold shares of stock. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71 (2006). It arises only when there has been fraud in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975). As such, the Rule 10b-5 claim is personal to the purchaser or seller and remains with that person; it does not travel with the shares. The personal nature of federal

50

securities claims manifests itself in the fact that class certification generally must be obtained under Rule 23(b)(3).[22] By contrast, because Delaware corporate law claims are tied to the shares themselves, they are certified under Rules 23(b)(1) and (b)(2).[23]

It is theoretically possible that the Seller Class might possess federal securities law claims or other personal claims. For purposes of evaluating the premise of Hayes' many objections, two points matter. First, none of the Delaware corporate claims are personal claims. Second, Hayes has not provided any reason to believe that any of the Class's personal claims, including hypothetical federal securities law claims, have any value.

## B. The Objection To The Structure Of The Settlement

Initially, Hayes relies on his (in my view, flawed) premise to challenge the definition of the Class. The parties, conversely, ask the court to re-certify the Class. This

---

[22] *See, e.g., Glosser v. Cellcor Inc.*, 1995 WL 106527, at *3 n.6 (Del. Ch. Mar. 10, 1995) (Allen, C.) ("Numerous federal courts have certified actions alleging federal securities violations as class actions under Federal Rules of Civil Procedure Rule 23(b)(3)."). *See generally* 7A Wright, Miller & Kane, *supra*, § 1781.1 (noting that "Rule 23(b)(3) has been used quite frequently in cases involving securities frauds").

[23] *See, e.g., Leon N. Weiner & Assocs., Inc. v. Krapf*, 584 A.2d 1220, 1227 (Del. 1991) (finding class action properly maintainable under Rule 23(b)(1)(A) and 23(b)(2)); *In re Mobile Commc'ns Corp. of Am., Inc., Consol. Litig.*, 1991 WL 1392 (Del. Ch. Jan. 7, 1991) (Allen, C.) ("Typically an action challenging the propriety of director action in connection with a merger transaction is certified as a (b)(1) or (b)(2) class because . . . all members of the stockholder class are situated precisely similarly with respect to every issue of liability and damages"), *aff'd*, 608 A.2d 729 (Del. 1992) (ORDER); *see also Turner v. Bernstein*, 768 A.2d 24, 31 (Del. Ch. 2000) (Strine, V.C.) (declining to certify a class under Rule 23.1(b)(3) where "any monetary remedy due to the Proposed Class will be calculated on a per share, rather than per shareholder, basis"); *Joseph v. Shell Oil Co.*, 1985 WL 21125, at *5 (Del. Ch. Feb. 8, 1985) (declining to certify a class under Rule 23.1(b)(3) because "if a finding of damages occurs, the damages will be mathematically allocated on a per share basis to all the stockholders in similar circumstances").

decision does neither. The Class was properly certified, and this court's earlier certification order remains in effect.

After a contested motion for class certification, the court certified a class comprising "the holders of shares of Activision common stock that were outstanding as of July 25, 2013 (the 'Class Shares'), in their capacities as holders of Class Shares, together with their heirs, assigns, transferees, and successors-in-interest in each case in their capacity as holders of Class Shares." Dkt. 330 ¶ 1 (the "Class"). The date selected was when the Board approved the Restructuring and entered into the Stock Purchase Agreement. The class certification order stated that "[t]he defendants and their affiliates are excluded from the Class." *Id.* ¶ 2. The certification order further provided that notwithstanding the general exclusion of the defendants and their affiliates, "limited partners in ASAC and their affiliates are included in the Class, but only to the extent they own Class Shares outside of ASAC and ownership of those shares is not attributable to ASAC." *Id.* ¶ 3. This exception permitted funds managed by limited partners in ASAC, such as Fidelity, to qualify as Class members for shares owned outside ASAC.

### 1. Hayes' Request That The Class Focus On The Sellers

Relying on his general premise, Hayes argues that the definition of the Class "does not fit the class who suffered damages." Dkt. 352 at 25. According to Hayes, the Class definition

> provides for a "one-size-fits-all" Class, when many current and former public stockholders stand in different positions. . . . This Class definition treats those who held on July 25, 2013, but sold at any time after July 25, 2013, as having no interest in the claims. On the other hand, purchasers who bought after the [Restructuring] closed, with full knowledge of its

terms and effects, are considered the Class members with a live interest in the claims.

Dkt. 352 at 27. According to Hayes, "[t]he stockholders who were harmed [by the Restructuring] were those who were denied the opportunity to benefit from Vivendi's below-market sale." *Id.* at 27-28. Hayes does not request any specific relief based on this objection, but he presumably would like (i) a separate class or subclass defined as those stockholders who held shares at a particular instant on July 25 and (ii) for some or all of the Settlement consideration to flow directly to those holders.

In my view, the Class is defined properly. *PHLX I*, 945 A.2d at 1139-40. "[T]he law recognizes that when a claim is asserted on behalf of a class of stockholders challenging the fairness of the terms of a . . . transaction under Delaware law, the class will ordinarily consist of those persons who held shares as of the date the transaction was announced and their transferees, successors and assigns." *Prodigy*, 2002 WL 1767543, at *4. "[I]t is commonplace for class certification orders entered by this Court in actions involving the internal affairs of Delaware corporations to define the relevant class as all persons (other than the defendants) who owned shares as of a given date, and their transferees, successors and assigns." *Triarc*, 791 A.2d at 878-79.

For reasons that this decision has discussed at length, it is correct to treat "those who held on July 25, 2013, but sold at any time after July 25, 2013, as having no interest in the claims." Those persons "chose to dissociate their economic interests from the corporation and, by doing so, to forego the opportunity to benefit from . . . the class claims [and] the potential benefit to the corporation from the derivative claims." *Id.* at

875; *accord Sunstates*, 2001 WL 432447, at *3. They "made a conscious business decision to sell their shares into a market that implicitly reflect[s] the value of the pending and any prospective lawsuits." *Resorts Int'l*, 1988 WL 92749, at *10; *accord Prodigy*, 2002 WL 1767543, at *4. Those claims passed to the buyers, who are properly considered Class members with a live interest in the claims.

As this decision already has noted, it is theoretically possible that members of the Seller Class might have some personal claims, such as federal securities law claims, that the Settlement releases. The possible existence of those claims does not require a separate class or subclass.[24]

### 2.    Hayes' Objection To The Ambiguity Of The Class

Hayes next contends that the Class is ambiguous. Dkt. 352 at 25. He identifies two categories of shares, currently trading in the market, that are not Class Shares. The first comprises shares held by defendants or their affiliates on July 25, 2013. The second comprises shares issued after July 25. Hayes points out that millions of shares trade each day, that Class Shares cannot be distinguished from non-Class Shares, and that some purchasers will have acquired shares that were not Class Shares.

As to the first category—shares held by defendants or their affiliates on July 25, 2013—Hayes is incorrect. Those shares are Class Shares. The certification order defined the Class Shares as the "shares of Activision common stock that were issued and

---

[24] *PHLX I*, 945 A.2d at 1140 (reviewing and approving Court of Chancery case law); *see, e.g., Triarc*, 791 A.2d at 878-79 (certifying class that included former holders despite absence of benefits to former holders); *Prodigy*, 2002 WL 1767543, at *4 (same); *Resorts Int'l*, 1988 WL 92749, at *10-11 (same).

outstanding on July 25, 2013." Under that definition, all shares outstanding as of July 25 are Class Shares, regardless of whether or not they were held by the defendants or their affiliates. The certification order excluded defendants and their affiliates from the Class because the court could have found that the defendants were wrongdoers and ordered them to pay damages to the Class. If that occurred, then the exclusion ensured that the defendants and their affiliates would not share in the recovery. But that did not mean that the shares were not Class Shares or that an unaffiliated successor could not participate in the recovery. For example, Vivendi owned over 41 million shares on July 25 that Vivendi later sold to the public. Those shares were Class Shares, but if there had been a class recovery while Vivendi or its affiliates still owned them, then Vivendi and its affiliates could not have participated. Any amount that would have gone to Vivendi or its affiliates would have been redistributed among the other members of the Class. Once Vivendi sold its shares, however, Vivendi's unaffiliated successors could receive their *pro rata* share of any recovery. In my view, the certification order properly excluded the defendants from participating in any recovery and is not ambiguous in this respect.

As to the second category of shares—those issued by Activision after July 25, 2013—Hayes is correct. Those shares are not Class Shares. But for the purposes of the strong Delaware corporate law claims that were advanced in this litigation and formed the basis for the Settlement, the distinction does not matter. The Delaware causes of

55

action arose when Board approved the Stock Purchase Agreement on July 25, 2013.[25] Stockholders as of that date possessed those causes of action, and when they sold their shares, the claims and the right to participate in any recovery passed with them. Holders of shares issued after July 25 did not have any Delaware corporate law claims, so there is no need to identify holders of non-Class Shares for purposes of the release.

As discussed, it is possible that some persons might have personal claims, such as federal securities law claims. It is likewise possible that some of those persons might have bought or sold non-Class Shares. If that subset of persons has claims that are not released by the Settlement, then so be it. The defendants did not bargain for a release of those claims (likely because the claims are at best hypothetical). The time to address any administrative issues associated with litigating those claims would be in the next case, not this one, and only if the claims (whatever they might be) could survive a motion to dismiss. It is passing strange for Hayes to object to the Class definition as being too

---

[25] *See Kahn v. Seaboard Corp.*, 625 A.2d 269, 270 (Del. Ch. 1993) (Allen, C.) ("The wrong attempted to be alleged is the use of control over Seaboard to require it to enter into a contract that was detrimental to it and beneficial, indirectly, to the defendants. Any such wrong occurred at the time that enforceable legal rights against Seaboard were created."); *accord In re Mobilactive Media, LLC*, 2013 WL 297950, at *10 (Del. Ch. Jan. 25, 2013); *Sutherland v. Sutherland*, 2010 WL 1838968, at *9 (Del. Ch. May 3, 2010); *Hokanson v. Petty,* 2008 WL 5169633, at *5 (Del. Ch. Dec. 10, 2008) (Strine, V.C.); *In re Coca-Cola Enters., Inc.,* 2007 WL 3122370, at *5 (Del. Ch. Oct. 17, 2007), *aff'd sub nom. Int'l Bhd. Teamsters v. Coca-Cola Co.*, 954 A.2d 910 (Del. 2008) (ORDER); *see also Albert v. Alex Brown Mgmt. Servs., Inc.,* 2005 WL 1594085, at * 18 (Del. Ch. June 29, 2005) ("[A] claim accrues at the time of the alleged wrongdoing, and not when the plaintiff suffered a loss."); *Schreiber v. R.G. Bryan,* 396 A.2d 512, 516 (Del. Ch. 1978) ("[W]hat must be decided is when the specific acts of alleged wrongdoing occur, and not when their effect is felt.").

narrow. This shows that what is really trying to do is gum up the works, not raise legitimate objections. In my view, the Class definition is not ambiguous.

### 3.    Recertification

For their part, the parties to the Stipulation ask the court to recertify the Class to add the following language to the definition: "For avoidance of doubt, the Class includes anyone who acquired a Class Share after July 25, 2013." Stipulation, ¶ 1.1. This sentence is superfluous. As indicated by the prepositional phrase "[f]or avoidance of doubt," the language is confirmatory. Anyone who acquired a Class Share after July 25 is an assignee or transferee of, or a successor-in-interest to, a holder of a Class Share on July 25. There is no need to recertify the Class on that basis.

## C.    The Adequacy Of Notice

Court of Chancery Rules 23(e) and 23.1 require that notice of a proposed compromise of a representative action be provided to stockholders or class members "in such manner as the Court directs." Ct. Ch. R. 23(e) & 23.1. Adapting his premise to the notice phase, Hayes argues that the Seller Class did not receive a mailed notice. He also argues that the notice did not adequately describe the claims or the fact that the Seller Class is not receiving any consideration. These objections lack merit.

### 1.    The Adequacy Of Mailing

"[I]n the context of a proposed settlement, the Court typically enters a scheduling order that, in addition to setting a date for a settlement hearing, tentatively approves the form and content of the notice and sets forth the manner in which notice is to be given." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the*

*Delaware Court of Chancery* § 9.04[e] at 9-193 (2012). There is no requirement to mail a settlement notice to every single class member who ever owned a share of a publicly held company. *Cf.* Ct. Ch. R. 23(e) (permitting notice "by mail, publication or otherwise").

In the current case, the court entered a scheduling order which addressed the giving of notice. Paragraph 7 stated:

> The Court approves, in form and content, the Notice of Pendency and of Settlement of Action (the "Notice") filed by the parties with the Stipulation as Exhibit B and finds that the giving of notice substantially in the manner set forth herein meets the requirements of Court of Chancery Rules 23 and 23.1 and due process, is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto. No later than sixty (60) calendar days prior to the Settlement Hearing (the "Notice Date"), Activision shall mail, or cause to be mailed, by first class U.S. mail or other mail service if mailed outside the U.S., postage pre-paid, the Notice, substantially in the form annexed as Exhibit B to the Stipulation, to all persons who are current stockholders of record or were on July 25, 2013 record holders of common stock of Activision at their last known address appearing in the stock transfer records maintained by or on behalf of Activision. All Current Stockholders and all members of the Class who are record holders of Activision common stock on behalf of beneficial owners shall be directed to forward the Notice promptly to the beneficial owners of those securities. Additionally, Activision shall use reasonable efforts to give notice to all beneficial owners of common stock of Activision by providing additional copies of the Notice to any record holder requesting the Notice for purposes of distribution to such beneficial owners.

Dkt. 334 ¶ 7. The scheduling order further provided that "[n]o later than the Notice Date, Activision shall also file a copy of the Notice as an exhibit to a Form 8-K with the Securities and Exchange Commission. *Id.* ¶ 8.

Paragraph 7 of the scheduling order required that notice of the Settlement be mailed to "all persons who are [i] current stockholders of record or [ii] were on July 25, 2013 record holders of common stock of Activision." *Id.* ¶ 7. The notice thus went to two

readily identifiable stockholder lists that Activision's transfer agent could generate: record holders on July 25, 2013, and record holders as of the date of mailing. Paragraph 7 also required that Activision use "reasonable efforts to give notice to all beneficial owners of common stock of Activision by providing additional copies of the Notice to any record holder requesting the Notice for purposes of distribution to such beneficial owners." *Id.*

Hayes argues that the use of two record dates created a gap that omitted the Seller Class. In my view, the scheduling order could have required mailing only to a single list of record holders as of the date of mailing. Notice need only be sent to record holders. *Am. Hardware Corp. v. Savage Arms Corp.*, 136 A.2d 690, 692 (Del. 1957). Delaware law contemplates the use of a record date for delivering notice. *See* 8 *Del. C.* § 213; *see also id.* §§ 211(c), 222, 228(e), 262(d). Using two record dates went beyond what Delaware law requires.

Hayes also challenges the sufficiency of the mailing because the affidavit recites that the notice went to (i) record holders based on "a list from counsel" and (ii) to a database of "the largest and most common" nominees. Hayes questions the accuracy of counsel's list, but he has not offered any specifics. Absent evidence to the contrary, the court can rely on counsel to assist the Company in performing its obligations under the scheduling order. Returning to his focus on the Seller Class, Hayes posits that some members of the Seller Class might hold stock through nominees that were not in the database. "If an owner of stock chooses to register his shares in the name of a nominee,

he takes the risks attendant upon such an arrangement, including the risk that he may not receive notice of corporate proceedings." *Am. Hardware*, 136 A.2d at 692.

Activision used reasonable efforts to give notice to nominees and other beneficial owners. The use of a large database of common nominees accomplished this, as did the availability of additional notices for nominees who requested them. The settlement administrator caused over 180,000 copies of the notice to be mailed. The filing of a copy of the notice as an exhibit to a Form 8-K provided an additional means for beneficial owners to receive notice.

The record at the settlement hearing provided further evidence of the adequacy of notice. The public announcement of the basic terms of the Settlement in November 2014 was national news. ASAC promptly filed with the SEC an amended Schedule 13D setting forth the basic terms. Soon thereafter, the monetary portion of the Settlement was ranked as the largest cash derivative settlement in history. In addition to the Form 8-K, Activision has been featured the Stipulation and Notice prominently on the Investor Relations tab of its website.

Hayes himself did not require notice, and he timely objected. No one in the Class joined Hayes in objecting to notice or to the merits of the Settlement. In my view, notice was adequately distributed.

### 2. The Contents Of The Notice

A notice of settlement "need not adhere to the stringent disclosure requirements governing prospectuses for the marketing of securities under the federal disclosure laws." Wolfe & Pittenger, *supra*, § 9.04[e] at 9-194; *see also Prince v. Bensinger*, 244 A.2d 89,

92 (Del. Ch. 1968). A notice of settlement is sufficient if it "contains a description of the lawsuit, the consideration for the settlement, the location and time of the settlement hearing, and informs class members that additional information can be obtained by contacting class counsel." *PHLX I*, 945 A.2d at 1135 n.13. A notice is "not required to eliminate all occasion for initiative and diligence on the part of the stockholders." *Braun v. Fleming-Hall Tobacco Co.*, 92 A.2d 302, 309 (Del. 1952). An adequate notice describes the settlement, "puts stockholders upon notice as to the general nature of the subject matter, and warns them that their substantial interests are involved." *Geller v. Tabas*, 462 A.2d 1078, 1080 (Del. 1983). Armed with this information, any party interested in learning more can contact class counsel or "easily obtain all the details of the terms by examining the file in the Court of Chancery." *Braun*, 92 A.2d at 309.

According to Hayes, the most glaring deficiency is what he believes to be an inadequate description of the Class damages claim. The Notice states that

> [t]he Complaint seeks derivative and direct relief against the Vivendi Defendants, the Special Committee Defendants, the Management Defendants, and the ASAC Defendants with respect to the [Restructuring]. The Complaint alleges that the Vivendi Defendants, the Special Committee Defendants and Management Defendants breached their fiduciary duties by entering into the [Restructuring], and that the ASAC Defendants aided and abetted those alleged breaches. Among other things, the Complaint alleges, and the Defendants deny, that the Management Defendants usurped a corporate opportunity in purchasing shares of stock from Vivendi at a discount to the market price and obtained control over Activision, and that Vivendi assented to the [Restructuring] to obtain desired liquidity. The Complaint also challenges the initial appointment and subsequent re-nomination and reelection by some or all of the Special Committee Defendants and Management Defendants of directors Peter Nolan and Elaine Wynn to the Activision Board as a breach of fiduciary duty and a breach of the Stockholders Agreement by ASAC.

Notice ¶ 19. In my view, this paragraph adequately describes the claims. A stockholder that wished to find out more information about the particular claims being asserted could contact Lead Counsel or consult the docket.

Hayes also objects to the Notice's statement that the benefits of the Settlement inure directly to Activision and indirectly to the Class. In particular, Hayes criticizes the following language:

> Because this Action was brought as a class and derivative action on behalf of and for the benefit of a class of stockholders and Activision, the benefits of the Settlement will go to both Activision and the Class, as defined below. Individual Class members will not receive any direct payment of funds from the Settlement, but will obtain the benefits from the Settlement that are described in paragraph 29 below.

Notice at 2. This statement is not only non-objectionable; it is accurate.

Last, Hayes contends that the Notice contains confusing descriptions of who can object to the Settlement and when objections are due. Experience demonstrates that objecting stockholders are not sticklers about complying with the procedures for filing objections, and the court generally considers objections on the merits. "[I]n the absence of resulting prejudice to other participants, the Court's general practice has been to hear and consider all such objections and to deal with them substantively, notwithstanding the objector's failure to comply with the letter of the notice." Wolfe & Pittenger, *supra*, § 9.04[d] at 9-192. In the current case, I am confident that if anyone other than Hayes had objected to the quality of notice or the substantive terms of the Settlement, they would have come forward. The Settlement was too widely publicized and represents too

significant a development for Activision to reach any other conclusion. In my view, the contents of the Notice were adequate.

## D. The Adequacy Of The Settlement Consideration

Perhaps the most important task that the court has when considering a settlement in a representative action is to evaluate the adequacy of the settlement consideration. Determining adequacy does not require a definitive evaluation of the case on its merits. "To do so would defeat the basic purpose of the settlement of litigation." *Rome*, 197 A.2d at 53. The reviewing court instead should consider multiple factors including "(1) the probable validity of the claims, (2) the apparent difficulties in enforcing the claims through the courts, (3) the collectability of any judgment recovered, (4) the delay, expense and trouble of litigation, (5) the amount of the compromise as compared with the amount and collectability of a judgment, and (6) the views of the parties involved, pro and con." *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986). "The Court must especially balance the value of all the claims being compromised against the value of the benefit to be conferred . . . by the settlement." *In re MCA, Inc.*, 598 A.2d 687, 691 (Del. Ch. 1991).

In framing the standard that this court should apply when evaluating a settlement, the Delaware Supreme Court has used interchangeably concepts of fairness, reasonableness, and business judgment.[26] When applied to fiduciaries making decisions

---

[26] *See In re Infinity Broad. Corp. S'holders Litig.*, 802 A.2d 285, 289 (Del. 2002) ("Any decision of the Court of Chancery regarding the fairness of a proposed settlement is within the discretion of that court and requires an application of its own business judgment"); *Ala. By-Prods. Corp. v. Cede & Co. ex rel. Shearson Lehman Bros., Inc.*, 657 A.2d 254, 260 (Del. 1995) ("The unique fiduciary nature of the class action requires the Court of Chancery to participate in the consummation of any potential settlement to determine its intrinsic fairness"); *Kahn v.*

in other contexts, each concept ties to a different standard of judicial review: respectively, the entire fairness test, the intermediate standard of enhanced scrutiny, and the business judgment rule. The burdens on the parties and the court would vary greatly depending on which standard of review the Delaware Supreme Court intended.

---

*Sullivan*, 594 A.2d 48, 59 (Del. 1991) (describing trial court's determination as whether the settlement is "fair and reasonable"); *Resorts Int'l*, 570 A.2d at 266 (explaining that "[i]n essence, the trial court's function is to exercise its business judgment in deciding whether the settlement is reasonable in light of the factual and legal circumstances of the case"; calling on trial court to consider "[a]ll challenges to the fairness of the settlement" when "deciding whether the settlement is reasonable"; further stating that the Supreme Court reviews deferentially the trial court's determination of "the reasonableness of the settlement" and that the Supreme Court does not independently judge "the intrinsic fairness of the settlement"); *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1284 (Del. 1989) (stating that "when the Court of Chancery reviews the fairness of a settlement, it must evaluate all of the circumstances of the settlement by using its own business judgment"; noting that "the Court of Chancery's most important yardstick of a settlement's fairness is its business judgment"; describing the trial court's task as evaluating "the fairness of the settlement" and stating that the Supreme Court does not "evaluate independently the intrinsic fairness of the settlement"); *Nottingham P'rs v. Dana*, 564 A.2d 1089, 1102-1103 (Del. 1989) (stating that "[t]he reasonableness of a particular class action settlement is addressed to the discretion of the Court of Chancery, on a case by case basis, in light of all of the relevant circumstances"; also stating that the Court of Chancery must determine whether to approve the settlement "as reasonable through the exercise of sound business judgment"); *Polk*, 507 A.2d at 536 (stating that the trial court must determine whether the settlement is "fair and reasonable"; explaining that the trial court "exercises a form of business judgment to determine the overall reasonableness of the settlement"; noting that the Supreme Court does not independently "determine the intrinsic fairness of the settlement"); *Fins v. Pearlman*, 424 A.2d 305, 308-309 (Del. 1980) (stating that "the Court of Chancery is to use its own business judgment to determine whether the settlement is intrinsically fair" and that "[t]he Court of Chancery's responsibility and function is to examine the proposed settlement's intrinsic fairness"); *Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 100 (Del. 1979) ("In determining whether or not to approve a proposed settlement of a derivative stockholders' action in these circumstances, the Court of Chancery is called upon to exercise its own business judgment."); *Rome*, 197 A.2d at 53-54 (Del. 1964) (stating that "[b]ecause of the fiduciary character of a class action, the court must participate in the consummation of a settlement to the extent of determining its intrinsic fairness"; further stating that the court discharges its function by determining if the settlement is "reasonable"; citing factors for trial court to consider "through the exercise of sound business judgment"; noting that on appeal the Supreme Court does not "determine the intrinsic fairness of the settlement in the light of [its] own business judgment").

I have attempted to distill a single, practical standard from the various formulations deployed in the Delaware Supreme Court opinions. In my view, the court's role when acting as a fiduciary in the settlement context is

> to determine whether the settlement falls within a range of results that a reasonable party in the position of the plaintiff, not under any compulsion to settle and with the benefit of the information then available, reasonably could accept. In this sense, the Court's task is analogous to that of an attorney (also a fiduciary) who is asked by a client whether a settlement seems reasonable. The ultimate decision whether or not to settle rests with the client—indeed, it falls within the client's "business judgment"—but the lawyer appropriately can apply legal knowledge and experience to make an assessment of the likely outcomes so as to advise the client on whether the settlement is one that the lawyer believes the client legitimately could accept. The resulting judicial inquiry is most akin to range-of-reasonableness review, and the submissions and presentations received by the Court in a settlement hearing are consistent with that standard.

*Forsythe v. ESC Fund Mgmt. Co. (U.S.),* 2013 WL 458373, at *2 (Del. Ch. Feb. 6, 2013).

The Delaware Supreme Court has recognized that when evaluating a settlement, a trial court can determine initially whether the settlement consideration as a whole provides adequate consideration for a global release. *PHLX I*, 945 A.2d at 1136. If it does, the trial court can approve the settlement and then evaluate separately whether the settlement reasonably allocates the pool of available consideration among various claimants. *Id.* In my view, the Settlement easily warrants approval.

### 1. The Monetary Consideration

The monetary consideration of $275 million is the largest cash recovery ever achieved on stockholder derivative claims. The magnitude of the Settlement reflects that Lead Counsel advanced strong claims for breach of the duty of loyalty. That does not mean that the claims were without risk. Articulate witnesses, skilled counsel, and

65

polished experts would contend that (i) the Restructuring was highly beneficial to Activision and its stockholders, (ii) Kotick and Kelly's personal investment of $100 million was instrumental to putting a deal together and the positive stock price reaction, (iii) it was beneficial to take the stock that ASAC purchased off the market for one to four years, (iv) the secondary offering proposed by Vivendi was not viable, was presented for tactical reasons, and posed the risks that Vivendi might retain a large stake or the stock price might not increase as much as it did, (v) it was unreasonable to negotiate an alternative transaction structure given the billions of dollars needed to eliminate Vivendi's controlling stake, and (vi) any hypothetical alternative structure would be too speculative to credit.

In addition to the risks of losing on liability, there was risk associated with the possible remedies. Lead Counsel sought three potential monetary remedies: restitution, damages to Activision, and damages to unaffiliated stockholders. Lead Counsel correctly perceived that the court would be unlikely to require restitution from Kotick and Kelly *and* award damages against them. *See Bomarko, Inv. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1190 (Del. Ch. 1999) (concluding on the facts of the case that "any order requiring disgorgement would constitute a double recovery for the plaintiffs").

Restitution was the most likely and straightforward remedy. When the Restructuring closed, Kotick and Kelly achieved an immediate unrealized net profit of $178 million, and the present value of ASAC GP's projected gains after four years (assuming a 9.0x trading multiple) was $253.1 million (after deducting Kotick and Kelly's initial investment and without considering their entitlement to interest). An order

requiring disgorgement of these gains to Activision was a logical and plausible outcome, but it could have had collateral consequences for Activision. A final judgment holding Kotick and Kelly liable for breaching their duty of loyalty might have led to questions about their future with Activision and generated uncertainty about the Company's prospects. The certainty of the $275 million settlement payment compares favorably with the disgorgement remedy and avoids this risk.

An award of damages to Activision based on a disloyal failure to pursue the Over-the-Wall Transaction provided another logical remedy. The operative question was what price the court would find that an equity investor would have paid to buy a large block of Activision stock in advance of the public announcement of a repurchase transaction by Activision at $13.60 per share. Assuming the court used the then-current market price of $15.18 per share, this measure would translate into a damages award of $271.7 million. If the court used a higher figure, the damages would be greater, but if the court found that Activision would sold fewer shares in the Over-the-Wall Transaction than ASAC purchased in the Restructuring, then the damages would be less. The certainty of the $275 million settlement payment compared favorably with this outcome as well.

The least likely alternative was an award of damages to the Class based on the failure to pursue the Rights Offering, secondary offerings, or other alternatives. The defendants had a strong argument that as a matter of Delaware law, the unaffiliated stockholders had no right to be included in a particular form of alternative transaction. Lead Counsel would have had to establish that a loyal Board would have pursued a

transaction involving the public stockholders as the best available option, such that it was disloyal for the Board to follow an alternative course.

It would have been difficult for Lead Counsel to establish that a loyal Board would have pursued the Rights Offering. The factual record did not contain any references to a Rights Offering, suggesting that it was not consciously avoided, and Lead Counsel's expert did not find any strong transactional precedent. The Rights Offering would have required public registration of the rights, creating potential delay and risk of non-consummation, and pricing the rights at a discount to market to facilitate exercise was not viable because of restrictions imposed on Vivendi by French law. The amount of value that the stockholders might have obtained through a Rights Offering, and hence the potential quantum of damages, would have been lower than a restitutionary award or a damages recovery calculated based on the Over-the-Wall Transaction. The magnitude of the $275 million settlement payment to Activision and the indirect benefits that stockholders receive compare favorably with the risk-adjusted prospect of a damages award to the Class based on a Rights Offering.

It would have been more straightforward for Lead Counsel to establish that a loyal Board would have pursued at least some form of secondary offering, but that alternative would not have supported as large a damages award as the Over-The-Wall Transaction. As with the Rights Offering, there was no reason to suppose that Vivendi would price the secondary offering below market, rather than at a higher market-clearing price. Nor was it clear that only Activision's existing stockholders would have purchased the shares. Third parties could have bought them, raising additional questions about the quantum of

damages. Once again, the certainty of a $275 million settlement payment to Activision compares favorably to the alternative.

The monetary consideration provided by the Settlement also compares favorably with what Hayes bargained for in the Draft MOU. Hayes has claimed that his settlement was worth $85 million to Activision's public stockholders, but its actual value was less than that headline figure. If the shares were equivalent to $70 million in cash, as Hayes seemed to think, then the settlement was comparable to Activision making a $70 million payment to the public stockholders. Paragraph 1(a) of the Draft MOU contemplated that the issuance would take place within thirty days after the effective date of the Restructuring. Once the Restructuring closed, the public stockholders would own 63% of Activision, so the public stockholders would end up funding 63% of the $70 million. The defendants only would fund 37% of the $70 million, or $25.9 million. The incremental value that the settlement transferred to the public stockholders was therefore $25.9 million + $15 million, for a total of $40.9 million.

Another way to view the settlement contemplated by the Draft MOU is to measure the public stockholders' share of the post-dilution value of Activision. Paragraph 1(a) of the Draft MOU called for Activision to

> [i]ssue a number of shares of common stock . . . equal to $70,000,000 (seventy million) USD divided by the average, *i.e.* mean, closing price, rounded to the nearest cent, of a share of common stock of Activision on the NASDAQ Global Select Market on the ten trading days (*i.e.*, a day on which a closing price for Activision common stock was quoted on NASDAQ) preceding and including the Effective Date (the "Stock Price") on a pro rata basis to the members of the Class (as defined below) . . . .

Once the Restructuring closed, Activision would have 695.29 million shares of common stock outstanding. Using for purposes of illustration a stock price of $16.28, which was the closing price on October 9, 2013 (the date the Draft MOU was circulated), Activision would have to issue approximately 4.3 million shares to provide the public stockholders with nominal value of $70 million. After that number was added to the shares outstanding, the percentage of stock owned by the public would increase by 0.22%. As of October 9, Activision's stock price implied a total equity value for Activision of $11.319 billion. The settlement would not increase Activision's intrinsic value, only the public stockholders' share of it. By increasing the public stockholders equity stake by 0.22%, the settlement would increase their share of Activision's value by 0.22% of $11.319 billion, or approximately $25 million. The value of the settlement to the public stockholders was again $25 million + $15 million, or approximately $40 million.

Compared to the consideration contemplated by the Draft MOU, the Settlement provides an implied benefit to Activision's public stockholders of $173.25 million, given their ownership of approximately 63% of the entity. Admittedly the comparison is not so simple. The Draft MOU would have delivered its consideration a year earlier, and because of the endowment effect, parties prefer actual ownership. *See generally* Daniel Kahneman, Jack L. Knetsch & Richard H. Thaler, *Anomalies: The Endowment Effect, Loss Aversion, and Status Quo Bias*, 5 J. Econ. Perspectives 193 (1991). Stockholders therefore would not be ambivalent between $40 million in cash paid to them in 2014 and $63.5 million paid to Activision in 2015. For stockholders to regard those as equivalent, the amount paid to Activision would have to be higher. Here, it is significantly higher.

The Settlement yields an indirect benefit for the public stockholders more than *four times greater* than the value that would have been provided by the Draft MOU. In my view, the Settlement is superior to the consideration that Hayes and his counsel championed as adequate.

The manner in which the Settlement was reached provides further evidence of its reasonableness. It resulted from a protracted mediation conducted by a highly respected former United States District Court Judge, with the negotiations taking place in the shadow of an impending trial. *See Ryan*, 2009 WL 18143, at *5 ("The Settlement was reached after . . . . hard fought motion practice before this court, and . . . a mediation session with Judge Weinstein. The diligence with which plaintiffs' counsel pursued the claims and the hard fought negotiation process weigh in favor of approval of the Settlement."). The negotiation process falls at the opposite end of the spectrum from the routine disclosure-only settlements, entered into quickly after ritualized quasi-litigation, that plague the M&A landscape.

### 2. The Non-Monetary Consideration

The non-monetary consideration provided important additional benefits. The defendants' agreement to expand the Board by two seats and fill them with independent individuals unaffiliated with Kotick and Kelly or any limited partner of ASAC is a form of relief that Lead Counsel could not have obtained at trial. The addition of two new independent directors in July 2015 creates a facially independent Board majority.

The reduction of Kotick and Kelly's voting power from 24.9% to 19.9% similarly helps ensure that control over Activision shifts away from Kotick and Kelly and towards

the public stockholders. The Committee tried to cap Kotick and Kelly's voting power at 19.9%, but Kotick and Kelly refused. Lead Counsel had argued that Kotick and Kelly's block of 24.9%, coupled with the sizeable stakes owned by ASAC limited partners, gave them working control, especially so long as Vivendi needed Activision's cooperation to sell down its block through registered offerings. During the litigation, Lead Counsel learned that one of the ASAC limited partners—Fidelity—had counterbalancing interests, and Vivendi sold off its stake, increasing the public float and putting more shares in play for purposes of any stockholder vote. Together, these events support the reasonableness of capping Kotick and Kelly's voting power at the level desired by the Committee.

### 3. The Court's Assessment Of The Adequacy Of The Consideration

The consideration provided by the Settlement in exchange for a global release for the defendants falls within a range of results that reasonable parties on the plaintiffs' side (encompassing both Activision and the Class), not under any compulsion to settle and with the benefit of the information then available, reasonably could accept. The Settlement is therefore approved.

### E. The Allocation Of Settlement Consideration

The Settlement compromises both derivative and class claims. No consideration is passing directly to the Class. All of the monetary consideration flows to Activision, benefitting the Company directly and its current stockholders indirectly. The non-monetary consideration likewise benefits the current stockholders indirectly. Hayes objects to the failure to pay any consideration directly the Class, but this is hardly an

72

altruistic position. Hayes hopes that by reallocating the consideration, his counsel can justify a fee award and partially rectify the injustice they feel they suffered in the leadership dispute.

An allocation plan must be reasonable. *PHLX I*, 945 A.2d at 1137-38. A plan does not have to compensate all potential claimants equally. "A reasonable plan may consider the relative values of competing claims." *PHLX II*, 965 A.2d at 667. The claims in this case consist of (i) personal claims belonging to the Class, including the Seller Class, that have not been articulated and are hypothetical at best, and (ii) strong Delaware corporate law claims belong to Activision and its current stockholders.

The Settlement allocates no consideration to the unarticulated personal claims belonging to the Class. This is reasonable. The Settlement was driven by the Delaware corporate law claims. The probable validity of the unidentified personal claims is non-existent, and the possibility that they might have led to a monetary recovery is entirely hypothetical. "If it appears that those claims are weak or of little or no probable value or would not likely result in any recovery of damages by individual stockholders, it is fair to bar those claims as part of the overall settlement." *Triarc*, 791 A.2d at 876. The court's ability to bar weak personal claims extends to federal securities claims, even though the claims could not be litigated in this court. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996).

The Settlement allocates all of the monetary consideration to Activision. This also is reasonable. The Delaware corporate law claims that led to the monetary component of the Settlement were the dual-attribute claims relating to the Restructuring. The only

73

purely direct claim that existed in the case was the Voting Right Claim that the Delaware Supreme Court found meritless. Once that claim was rejected, the remaining claims were either purely derivative, like Count XI, or had dual attributes. I believe that when granting a remedy for dual-attribute claims, a court can impose a remedy at either the corporate or the stockholder level as the facts and equities of the case requires. *See, supra*, n.20. The same flexibility should exist when settling dual-attribute claims.

Hayes effectively contends that when settling dual-attribute claims, some form of consideration must flow to the stockholders directly. At the same time, Hayes argues that the claims that were asserted and the resulting damages theories were the same.[27] If so, then in light of the one-for-one correspondence between the holders of the direct claims (Activision's current stockholders) and the indirect beneficiaries of the derivative claims (Activision's current stockholders), there is very little (if any) practical difference between the two forms of settlement. If the consideration goes to Activision, current stockholders receive their proportionate share of the benefits indirectly. If a proportionate amount of the consideration goes to the unaffiliated stockholders directly, as Hayes prefers, they receive approximately the same amount, after the deduction of more significant administrative costs. Once again, the endowment effect must be considered, but in my view, assuming the claims and recoveries are functionally equivalent, the indirect benefits of the consideration adequately compensate the Class for the dual-

---

[27] *See* Dkt. 352 at 2 ("The class and derivative damages claims had the same liability and damages theories."); *id.* at 43 ("The class damages claims . . . tracked the derivative damages claims.").

attribute claims. The advantage of using the derivative remedy is primarily one of efficiency. Clark, *supra,* 289 (noting that the derivative action "elegantly sidesteps" administrative issues associated with class litigation).

The foregoing analysis accepts Hayes' assumption that the derivative and class remedies would be functionally equivalent. In reality, the prospects for a corporate-level recovery were much stronger than the prospects for a stockholder-level recovery. Derivative damages depended on the feasibility of the Over-the-Wall Transaction. Restitution to Activision depended largely on the feasibility of (i) the Over-the-Wall Transaction, (ii) the secondary offering alternative, or (iii) a hybrid of the two. Class damages, by contrast, rested on establishing the feasibility of the Rights Offering, which was an unlikely alternative. If Lead Counsel had focused on obtaining a Settlement that provided consideration directly to the Class, Lead Counsel could not have obtained as favorable a resolution of the case.

Perhaps ironically, the relief that Lead Counsel obtained on Count IX, the purely derivative claim, inures predominantly to the Class. By reducing the cap on Kotick and Kelly's voting power and by obtaining two additional Board seats for independent, outside directors, Lead Counsel effectively increased the voting power and influence of the unaffiliated shares. Although these corporate governance measures can be viewed as good for Activision, they are primarily good for the Class.

In my view, the allocation of consideration in the Settlement is reasonable. Under the circumstances of the case, the fact that the Class is not receiving any direct payment does not provide grounds for disapproval or warrant reallocation.

**F.      The Fee Award For Lead Counsel**

"Under the 'common benefit' exception [to the general rule that a party must pay its own counsel fees], a litigant may . . . receive an award of attorneys' fees if: (a) the action was meritorious at the time it was filed, (b) an ascertainable group received a substantial benefit, and (c) a causal connection existed between the litigation and the benefit." *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006). The doctrine is "founded on the equitable principle that those who have profited from litigation should share its costs." *Goodrich v. E.F. Hutton Gp., Inc.*, 681 A.2d 1039, 1044 (Del. 1996). "Otherwise, 'persons who obtain the benefit of a lawsuit without contributing to its cost [freeriders] are unjustly enriched at the successful litigant's expense.'" *Id.* (alteration in original; quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

The power to award fees for a common benefit "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations." *Tandycrafts, Inc. v. Initio P'rs*, 562 A.2d 1162, 1166 (Del. 1989). When awarding fees, the Court of Chancery "must make an independent determination of reasonableness." *Goodrich*, 681 A.2d at 1046. When evaluating the reasonableness of a fee award, the Court of Chancery considers the factors identified by the Delaware Supreme Court in *Sugarland Industries, Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). In *Sugarland*, the factors appear diffusely throughout the opinion. The Delaware Supreme Court has since summarized them concisely as follows: "1) the results achieved; 2) the time and effort of counsel; 3) the relative complexities of the litigation; 4) any contingency factor; and 5)

76

the standing and ability of counsel involved." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1254 (Del. 2012).

### 1. The Benefits Conferred

"Delaware courts have assigned the greatest weight to the benefit achieved in litigation." *Id.* "When the benefit is quantifiable, . . . *Sugarland* calls for an award of attorneys' fees based upon a percentage of the benefit." *Id.* at 1259. The Delaware Supreme Court has cited with approval this court's practice of "awarding lower percentages of the benefit where cases have settled before trial" and awarding greater percentages as the litigation progresses. *Id.*

> When a case settles early, the Court of Chancery tends to award 10-15% of the monetary benefit conferred. When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards in the Court of Chancery range from 15-25% of the monetary benefits conferred. . . . Higher percentages are warranted when cases progress to a post-trial adjudication.

*Id.* at 1259-60 (footnotes omitted). "Delaware case law supports a wide range of reasonable percentages for attorneys' fees, but 33% is the very top of the range of percentages." *Id.* (internal quotation marks omitted).

The incentive effect of using percentages that increase depending on the stage of the litigation counteracts a natural human tendency towards risk aversion.

> Just as it is human nature to regard your personal accomplishments and performance as above-average (even exceptional), it is human nature to be risk-averse. For plaintiffs' counsel, risk aversion manifests itself as a natural tendency to favor an earlier bird-in-the-hand settlement that will

ensure a fee, rather than pressing on for a potentially larger recovery for the class at the cost of greater investment and with the risk of no recovery.[28]

The promise of a larger potential share of the benefit nudges representative counsel's incentives towards greater alignment with the class or entity on whose behalf they are litigating.[29]

The incentive effects of the sliding scale apply equally to large and small settlements. Risk aversion can be most problematic when entrepreneurial counsel are negotiating for incremental dollars after investing much uncompensated time and expense. As Chief Justice Strine explained while serving as a member of this court, "I've said this before and I will continue to say it—that, you know, you don't reduce people's fees because they gain much. You should, in fact, want to create an incentive for real

---

[28] *In re Orchard Enters., Inc. S'holders Litig.*, 2014 WL4181912, at *8 (Del. Ch. Aug 22, 2014); *see also* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 690 (1986) ("[P]laintiff's attorneys have an incentive to settle prematurely and cheaply when they are compensated on the traditional percentage of the recovery basis."); Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004) ("The class attorney's egoistic incentive is to maximize his or her fees—awarded by the court if the action succeeds—with a minimized time-and-effort investment. This objective does not align with a both zealous and time-consuming prosecution of the class action, aimed at maximizing the amount of recovery for the class members."). For now-classic treatments of this problem, see Kevin M. Clermont & John D. Currivan, *Improving on the Contingent Fee*, 63 Cornell L. Rev. 529, 543-46 (1978); Geoffrey P. Miller, *Some Agency Problems in Settlement*, 16 J. Legal Stud. 189, 198-202 (1987); and Murray L. Schwartz & Daniel J.B. Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation*, 22 Stan. L. Rev. 1125, 1133-39 (1970).

[29] *See Forsythe v. ESC Fund Mgmt. Co.*, 2012 WL 1655538, at *5 (Del. Ch. May 9, 2012); *In re Emerson Radio S'holder Deriv. Litig.*, 2011 WL 1135006, at *3-4 (Del. Ch. Mar. 28, 2011).

litigation." *In re Am. Int'l Group, Inc. Cons. Deriv. Litig.*, C.A. No. 769-VCS, tr. at 9-10 (Del. Ch. Jan. 25, 2011).

This case settled one month before trial. "While there are outliers, a typical fee award for a case settling at this stage of the proceeding ranges from 22.5% to 25% of the benefit conferred." *Orchard*, 2014 WL 4181912, at *8. Selecting an appropriate percentage requires an exercise of judicial discretion. *Ams. Mining*, 51 A.3d at 1254. Nevertheless, "from a systemic standpoint, departures from the precedential ranges should be rare." *Orchard*, 2014 WL 4181912, at *8.

> If counsel can take the lesser bird-in-the-hand and get a greater percentage from the court, then the incentive to press on is undermined. The reward for an exceptional result comes not from a special appeal for case-specific largesse, but rather from the percentage calculation itself. A percentage of a low or ordinary recovery will produce a low or ordinary fee; the same percentage of an exceptional recovery will produce an exceptional fee. The wealth proposition for plaintiffs' counsel is simple: If you want more for yourself, get more for those whom you represent.

*Id.* (citation omitted). As the Delaware Supreme Court has stated, the "common fund is itself the measure of success." *Ams. Mining*, 51 A.3d at 1259.

An award of 20% of the $275 million would be $55 million. An award of 22.5% would be $61.88 million. An award of 25% would be $68.75 million.

In addition, Lead Counsel obtained substantial non-monetary relief. The Settlement adds two independent directors and reduced Kotick and Kelly's voting power from 24.9% to 19.9%. Establishing an independent Board majority and reducing the stockholder-level control of insiders at a corporation with a market capitalization in

excess of $15 billion is a valuable non-monetary benefit. Precedent suggests that an award of $5-10 million could be justified.[30]

## 2. The Complexity Of The Litigation

One of the secondary *Sugarland* factors is the complexity of the litigation. All else equal, litigation that is challenging and complex supports a higher fee award.

The litigation in this case was more complex than the typical Court of Chancery case. The legal issues were more complex because the Restructuring was a bespoke transaction; it was not a familiar scenario such as a controller squeeze-out or a third-party M&A deal. Vivendi's status as a foreign issuer raised additional complications. The remedial issues were unique and forced Lead Counsel and their expert to develop potentially precedent-setting theories of damages.

The factual issues in the case were particularly challenging. As noted, Lead Counsel obtained and reviewed in excess of 800,000 pages of documents from the defendants and numerous non-parties, as shown by the following table:

| Producing Party | Pages |
| --- | --- |
| Activision Blizzard, Inc. | 220,325 |
| Allen & Company | 12,410 |

---

[30] *See In re Google Inc. Class C S'holder Litig.*, Cons. C.A. No. 7469-CS, tr. at 19-20 (Del. Ch. Oct. 28, 2013) (awarding $8.5 million plus expenses for a "largely corporate governance settlement" in which "the benefits are substantial" and "somewhere between a solid single and a double"); *In re Yahoo! S'holders Litig.*, C.A. 3561-CC, let. op. at 1 (Del. Ch. Mar. 6, 2009) (awarding $8.4 million for "substantial benefit" of amending employee severance plan in a manner that "made it less expensive to sell Yahoo, making the company a more attractive target to potential suitors"); *Minneapolis Firefighters' Relief Assoc. v. Ceridian Corp.*, C.A. No. 2996-CC (Del. Ch. Feb. 25, 2008) (awarding $5.4 million for empowering a potential buyer to present a leveraged recapitalization proposal and eliminating a termination right for the merger partner in the event a new slate of directors was elected before the merger closed).

| | |
|---|---:|
| ASAC II LP | 4,479 |
| Bank of America Merrill Lynch | 967 |
| Barclays Bank PLC | 59,357 |
| Centerview | 60,327 |
| Covington & Burling LLP (counsel to Tencent) | 4,708 |
| Davis Selected Advisors | 7,974 |
| FMR LLC | 16,039 |
| Goldman Sachs & Co. | 74,903 |
| JP Morgan | 156,733 |
| Brian Kelly | 2,419 |
| Robert Kotick | 9,195 |
| LGP | 13,137 |
| Special Committee | 18,569 |
| Vivendi | 151,303 |

To obtain, review, and analyze these documents required significant effort, including extensive and numerous follow-up communications with the producing parties to ensure timely and comprehensive productions. Vivendi initially resisted production of its electronic documents, resulting in a motion to compel and a written decision. *See In re Activision Blizzard, Inc. S'holder Litig.*, 86 A.3d 531 (Del. Ch. 2014). All defendants asserted privileges and generated mammoth privilege logs, requiring extensive follow up.

Obtaining documents also required third party practice. For example, Lead Counsel initially served a subpoena in Massachusetts on a Fidelity affiliate. After the affiliate objected and moved to quash, Lead Counsel served a new subpoena on a Delaware affiliate. Fidelity again objected, forcing Lead Counsel to move to enforce. That motion was resolved when Fidelity relented and agreed to produce all responsive, non-privileged documents.

Language issues further complicated matters. After this court overruled Vivendi's objections, Vivendi produced numerous documents written in French. Lead Counsel had

to identify the documents warranting unofficial and official translation, obtain the translations, and review them.

Piecing together the chronology required mixing and matching documents from multiple sources. In the ordinary course, Kotick and Kelly routinely deleted emails and electronic files. Kotick often preferred receiving documents by fax rather than email and considered it a good business practice to vet any communication orally before anything was sent to him. Lead Counsel had to engage in careful detective work to understand what happened, given the wholesale assertions of privilege and the contemporaneous destruction of documents.

Also as noted, Lead Counsel deposed twenty-three fact witnesses, as shown by the following table:

| Name | Affiliation | Date |
|---|---|---|
| Joseph Tuite | Brian Kelly's family office | June 11, 2014 |
| Danton Goei | Davis Selected Advisors | June 18, 2014 |
| Andrew Boyd | Fidelity | June 20,2014 |
| Kris Galashan | LGP | June 25, 2014 |
| Mark Fiteny | JP Morgan | July 1, 2014 |
| Jean-François Dubos | Director Defendant | July 2, 2014 |
| Frédéric Crépin | Director Defendant | July 3, 2014 |
| Robert Pruzan | Centerview | July 8, 2014 |
| Richard Sarnoff | Director Defendant | July 9, 2014 |
| Régis Turrini | Director Defendant | July 9, 2014 |
| Robert J. Corti | Director Defendant | July 15, 2014 |
| Brian Kelly | Director Defendant | July 15, 2014 |
| Gregory Dalvito | Barclays Bank PLC | July 16, 2014 |
| Robert Morgado | Director Defendant | July 17, 2014 |
| Robert Kotick | Director Defendant | July 22, 2014 & Sept. 12, 2014 |
| Jean-Rene Fourtou | Vivendi | July 23, 2014 |
| Nancy Peretsman | Allen & Company, LLC | July 24, 2014 |
| Philippe Capron | Director Defendant | July 24, 2014 |

| Michael Ronen | Goldman Sachs & Co. | July 29, 2014 |
| Anwar Zakkour | Former JP Morgan | July 31, 2014 |
| Peter Nolan | LGP | July 31, 2014 |
| Jonathan Mattern | Centerview | August 7, 2014 |
| Ian The | Centerview | August 8, 2014 |

The complicated legal issues and the need for extensive discovery made this case more complex than most. This factor supports an award at the higher end of the range.

### 3. The Contingent Nature Of The Representation

Another secondary *Sugarland* factor is the contingent nature of the representation. It is the "public policy of Delaware to reward risk-taking in the interests of shareholders." *In re Plains Res. Inc.*, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005). Not all contingent cases involve the same level of contingency risk.

> Unlike the now-ubiquitous pre-closing expedited challenges to mergers that are routinely settled with supplemental disclosures, [Lead] Counsel did not enter the case with a ready-made exit. [Lead] Counsel faced risk in pursuing a damages remedy, including the realistic possibility that [Lead] Counsel would receive nothing for their time and effort.

*Orchard*, 2014 WL 4181912, at *9.

The prosecution of the litigation by co-lead counsel was a largely undiversified, entrepreneurial undertaking. F&G and BE&S are both small firms, with two partners and three partners respectively. Two partners from each firm were deeply involved in all stages of the litigation and took or defended all of the depositions. Both firms had limited ability to work on other cases and turned away potential new business. A partner of BE&S took out a personal loan due to the litigation expense of this case. In addition, F&G recapitalized itself effective April 30, 2014. In part to ensure that the firm could

finance this litigation and operate regardless of its outcome, F&G took out a five-year loan secured by personal guarantees from its two partners.

This case involved true contingency risk. This factor supports an award at the higher end of the range.

### 4. The Time And Effort Expended

"The time and effort expended by counsel serves [as] a cross-check on the reasonableness of a fee award." *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1138 (Del. Ch. 2011). "This factor has two separate but related components: (i) time and (ii) effort." *Id.* "The time (*i.e.* hours) that counsel claim to have worked is of secondary importance." *Id.* "[M]ore important than hours is effort, as in what plaintiffs' counsel actually did." *Ams. Mining*, 51 A.3d at 1258 (internal quotation marks omitted).

As demonstrated by the discussion of the complexities of the litigation, Lead Counsel did a lot. And they did it all under the pressure of a schedule designed to get the case to trial within one year. Lead Counsel did not throw a horde of junior timekeepers at the matter that would have inflated the overall number of hours. It created efficiencies for the four senior lawyers who comprised the trial team to take all of the depositions, work with the expert, and immerse themselves in all facets of the case. While the size of the award implies a generous hourly rate, in this case it is justified by the effort.

### 5. The Standing And Ability Of Counsel

No one disputes the standing or ability of counsel or argues that the award should be adjusted downward because of this factor. To the contrary, Lead Counsel brought a particular blend of expertise, initiative, and ingenuity to the case. In my view, few

84

litigation teams could have achieved this result against the determined, well-represented, and aggressive adversaries that Lead Counsel faced.

### 6. Deference To A Negotiated Agreement

The Delaware Supreme Court has held that "the Court of Chancery must make an independent determination of reasonableness on behalf of the common fund's beneficiaries, before making or approving an attorney's fee award." *E.F. Hutton*, 681 A.2d at 1046. As this court has observed, *E.F. Hutton* "unequivocally" requires that "where plaintiffs and defendants agree upon fees in settlement of a class action lawsuit, a trial court must make an independent determination of reasonableness of the agreed to fees." *In re Nat'l City Corp. S'holders Litig.*, 2009 WL 2425389, at *5 (Del. Ch. July 31, 2009) (internal quotation marks omitted), *aff'd*, 998 A.2d 851 (Del. 2010). "The fact that a fee is negotiated . . . does not obviate the need for independent judicial scrutiny of the fee because of the omnipresent threat that plaintiffs would trade off settlement benefits for an agreement that the defendant will not contest a substantial fee award." *Id.* at *5. Notwithstanding these statements, some of this court's decisions speak of giving deference to a negotiated fee agreement.[31] In my view, any apparent tension can be harmonized by differentiating between evaluating a range of reasonableness and determining a specific amount. Under Delaware Supreme Court precedent, the court must

---

[31] *See Prodigy*, 2002 WL 1767543, at *6 ("Where, as here, the fee is negotiated after the parties have reached an agreement in principle on settlement terms and is paid in addition to the benefit to be realized by the class, this court will also give weight to the agreement reached by the parties in relation to fees."); *In re AXA Fin., Inc.*, 2002 WL 1283674, at *7 (Del. Ch. May 22, 2002) (same).

determine that the award falls within a reasonable range. If it does, then a court can defer to the parties' negotiated amount. *See Forsythe*, 2012 WL 1655538, at *7 (remarking that a negotiated fee application which "falls within a reasonable range [warrants] deference to the parties' negotiated amount").

After reaching agreement with defendants on the substantive terms of the settlement, Lead Counsel and Activision negotiated an agreement whereby defendants would not oppose an application for a fee award up to $72.5 million. Assuming that the non-monetary benefits support an award of $5-10 million, the agreed-upon fee ranges from 22.7% to 24.5% of the monetary benefit. This falls within the range of reasonableness for the stage at which the litigation settled. This decision therefore approves as reasonable the fee award of $72.5 million that was negotiated after agreement on the substantive settlement terms.

## G. No Fee Award For Pfeiffer And Benston's Counsel

Pfeiffer and Benston have sought a fee award for their counsel. They have made this claim jointly, because neither was involved for the duration of the case. In September, after Hayes and Pacchia filed suit, Pfeiffer made a Section 220 demand. When Hayes' counsel circulated the Draft MOU, Pfeiffer's demand was still outstanding. After the Delaware Supreme Court's decision, Pfeiffer filed a Section 220 action, but he dismissed it when Activision challenged his status as a stockholder. Pfeiffer's counsel then found Benston, who made a Section 220 demand, followed up with a Section 220 action, and obtained documents in February 2014, after Lead Counsel was already deep into the merits.

According to Pfeiffer and Benston, their counsel deserves a fee award of $7.25 million. They should get this amount because when Hayes' counsel tried to settle the case, they attempted to get Pfeiffer's counsel on board. Pfeiffer's counsel declined to sign the Draft MOU. Pfeiffer and Benston claim that their counsel "prevented an inferior settlement from being consummated, paving the way for the . . . Settlement currently before the Court." Dkt. 349 at 7.

The power to award fees for a common fund or benefit "is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations." *Tandycrafts*, 562 A.2d at 1166. "Not everyone who contributes to a benefit gets a fee award." *Orchard*, 2014 WL 4181912, at \*9.

One of the factors identified in *Sugarland* is "whether the plaintiff can rightly receive all the credit for the benefit conferred or only a portion thereof."[32] The law has long recognized a distinction between an abstract causal connection and a proximate cause. "[H]arm flowing from an event in the but-for sense at some point becomes too attenuated to give rise to liability. Our law will not award damages for a kingdom when the wrong concerns a two-penny nail." *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1,

---

[32] *Plains Res.,* 2005 WL 332811, at \*3; *accord Allied Artists Pictures Corp. v. Baron*, 413 A.2d 876, 878 (Del. 1980) (explaining that Delaware public policy is to compensate counsel "for the beneficial results they produced" and requiring both a meritorious claim and "a causal connection to the conferred benefit"); *Aaron v. Parsons*, 139 A.2d 365, 367 (Del. Ch.) ("[C]ounsel for plaintiffs are entitled to be compensated for the part played by this suit insofar as it contributed to the benefits received by the corporation in the settlement"), *aff'd*, 144 A.2d 155 (Del. 1958).

32 (Del. Ch. 2009). Sufficient causal attenuation similarly can result in the denial of an application for a fee award.

Pfeiffer and Benston claim that the defendants would have signed the Draft MOU if their counsel had signed. That is not credible. At that point, Benston had not yet appeared, and Pfeiffer only had made a Section 220 demand. He claimed to own a total of two shares of stock, and Activision disputed whether he owned stock at all. Rather, the defendants refused to sign because they were bullish on their chances before the Delaware Supreme Court. They had written highly aggressive briefs and made new factual and legal arguments that Hayes had not been able to counter fully for the first time on appeal. As Hayes' counsel anticipated, the successful appeal killed the Draft MOU because it removed the bargaining leverage that was a byproduct of this court's injunction. Pfeiffer's counsel was not a meaningful threat.

Assuming Pfeiffer and Benston's counsel did play some attenuated role in the defendants' decision not to sign, they can claim to have contributed causally to the Settlement only in the metaphysical sense that the flap of a butterfly's wings in Beijing may lead to a thunderstorm in Delaware, or that a stone thrown into the ocean off the Canary Islands creates a wave which may someday wash the beaches of Lewes. This is not a situation in which peer-reviewed statistical studies provide a responsible foundation for awarding fees based on a contingent event. *Cf. In re Compellent Technologies, Inc. S'holder Litig.*, 2011 WL 6382523, at *22 (Del. Ch. Dec. 9, 2011) (relying on statistical studies and expert report when exercising discretion regarding amount of award for modifications to defensive measures).

Pfeiffer and Benston mention halfheartedly their counsel's effort to get a piece of the action on remand, but their application for an issue-specific role was denied. They did not make any substantive contribution to the case. Because they did not generate benefits for Activision or the Class, Pfeiffer and Benston's counsel are not entitled to a fee award.

## H.  The Special Award For The Lead Plaintiff

The defendants and Hayes object to the Lead Plaintiff receiving a special award of $50,000. The defendants' objection will not be considered because they breached the Stipulation by making this argument. In the Stipulation, they agreed not to "object to or otherwise take any position on" the negotiated $72.5 million fee application. Stipulation § 4.1. They did not reserve their right to object to the Lead Plaintiff award. Not taking a position on the fee application that falls below a negotiated amount includes not taking a position on the allocation of the award.

Hayes returns to his basic premise. He contends that when the Class only receives benefits from the Settlement indirectly, the Lead Plaintiff should not get money directly. The short answer to this objection is that Pacchia served as the Lead Plaintiff and is receiving a payment in that capacity. The other stockholders did not.

Delaware decisions have approved similar awards for lead plaintiffs under similar circumstances. *See Orchard*, 2014 WL 4181912, at *13 n.8 (collecting cases). The amount is reasonable and will be paid out of Lead Counsel's fee, so the award does not harm Activision or the Class. The award has been fully disclosed and is not so large as to raise the specter of a conflict of interest or an improper lawyer-client entanglement. The Lead Plaintiff participated meaningfully in the case, sat for a deposition, and attended

89

hearings and the mediation. He has been subjected to vigorous attacks throughout these proceedings, first by Hayes and his counsel during the leadership fight, next by the defendants at the class certification phase, and now by both during the settlement phase. The special award provides him with reasonable compensation for taking on the additional burden of serving as lead plaintiff.

### III.    CONCLUSION

The Settlement is approved. Lead Counsel is awarded fees and expenses of $72.5 million. Pfeiffer and Benston's counsel are not entitled to any fee award. Lead Counsel has permission to pay Pacchia a special award of $50,000 out of the amount of the fee.